Crystal R. GRAHAM, in her own right and on behalf of John P. Graham, Deceased, Plaintiff–Appellee, Cross–Appellant,

v.

SAUK PRAIRIE POLICE COMMISSION, Village of Sauk City, Wisconsin and Village of Prairie Du Sac, Wisconsin, Defendants–Appellants, Cross–Appellees,

Robert Rentmeester, Defendant, Cross–Appellee.

Nos. 89–1537, 89–1652, and 89–2385.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1989.

Decided Oct. 3, 1990.

Ronald J. Kotnik, David E. Rohrer, Lathrop & Clark, Madison, Wis., for Graham.

Carroll Metzner, Jean M. Wiencek, Bell, Metzner, Gierhart & Moore, Madison, Wis., Wayne Mueller, Prairie Du Sac, Wis., for defendants-appellants, cross-appellees.

Before CUMMINGS, FLAUM, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

The Villages of Sauk City and Prairie Du Sac, Wisconsin, and their police commission, the Sauk Prairie Police Commission, hired John Mueller as a police officer in April of 1983. On September 16, 1986, while Mueller was on patrol, he received a radio call for assistance from a Department of Natural Resource's conservation warden. The warden informed Mueller about a

suspect in a pickup truck who was believed to be carrying controlled substances. Pursuant to the warden's directions, Mueller went to the house of John Graham. Mueller parked his squad car in Graham's driveway behind a pickup truck in which Graham was seated. Mueller repeatedly ordered Graham to get out of his truck and produce a driver's license. After Graham continuously refused, Mueller and the conservation warden removed Graham from the truck, placed him face down on the driveway and handcuffed Graham's hands behind his back. Mueller then drew his service revolver and fired two shots into Graham's head. Graham died from the gunshot wounds shortly thereafter. It is undisputed that Graham was not fleeing and posed no threat of death or serious injury to Mueller or any other person at the time of the shooting. Also undisputed is the fact that Mueller was suffering from chronic paranoid schizophrenia at the time he shot Graham.

Crystal Graham brought this suit on behalf of the deceased, John Graham, and in her individual capacity as his surviving spouse and heir. Graham sued Mueller's estate (Mueller died shortly after Graham initiated this suit) under 42 U.S.C. § 1983 claiming that Mueller violated her rights under the fourteenth amendment and those of her deceased husband under the fourth and fourteenth amendments. The district court granted summary judgment in favor of Graham regarding Graham's fourth amendment excessive force claim and fourteenth amendment loss of life claim. The court also granted summary judgment in favor of Graham regarding her fourteenth amendment claim of lost society and companionship. In addition, the district court held on summary judgment that Wisconsin law required the Sauk Prairie Police Commission and the Villages of Sauk City and Prairie Du Sac to indemnify Mueller's estate for any monetary damages that might be entered against Mueller.

Crystal Graham also brought a § 1983 suit directly against the two villages, the police commission and Police Chief Robert Rentmeester under a theory of supervisory liability for Mueller's unconstitutional killing of Graham. The district court granted summary judgment in favor of the villages, the police commission and Rentmeester on this claim.

In February, 1989, a jury trial was held solely to determine the amount of damages owed by Mueller's estate. The jury awarded Crystal Graham $300,000 for lost society and companionship and $130,200 in compensatory damages. The jury also awarded the estate of John Graham $550,000 for loss of life. The jury did not award any damages for pain and suffering.

The villages and the police commission appeal the district court's order that they indemnify Mueller's estate; in addition, they appeal the district court's award of attorney fees and loss of life damages in favor of Graham. Crystal Graham cross-appeals the district court's grant of summary judgment in favor of the villages, the police commission, and Rentmeester on her municipal liability claim. For the reasons discussed below, we affirm the district court on all issues.

## Indemnification

██ The villages and the police commission contend that the district court erred in requiring them to indemnify Mueller's estate. The Wisconsin statute that requires a municipality to indemnify its employees, Wis.Stat. § 895.46, provides in pertinent part:

(1)(a) If the defendant in any action or special proceeding is a public officer or employe and is proceeded against in an official capacity or is proceeded against as an individual because of acts committed while carrying out duties as an officer or employe and the jury or the court finds that the defendant was acting within the scope of employment, the judgment as to damages and costs entered against the officer or employe in excess of any insurance applicable to the officer or employe shall be paid by the state or political subdivision of which the defendant is an officer or employe.

The villages and the police commission advance two arguments why they are not

required to indemnify Mueller's estate. First, they argue that the municipal tort immunity statute, Wis.Stat. § 893.80(4), precludes indemnification because Mueller committed an intentional tort when he shot Graham. Alternatively, they argue that indemnification is not required under the indemnity statute because Mueller was not acting "within the scope of employment" when he shot Graham. We will address these arguments in turn.

Wisconsin's municipal tort immunity statute provides that, "[n]o suit may be brought against any ... political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees...." Wis.Stat. § 893.80(4). It is undisputed that Mueller committed an intentional tort when he shot Graham. While recognizing that the Wisconsin indemnity statute contains no explicit exception for employee intentional torts, the defendants contend that a conflict exists between the indemnity statute and the intentional tort immunity statute. The defendants argue that the conflict can be avoided only if we conclude that the Wisconsin legislature intended the immunity statute to preclude indemnity in one type of action—an action based upon a municipal employee's intentional torts. The defendants contend that the Wisconsin Supreme Court's decision in *Strong v. City of Milwaukee*, 38 Wis.2d 564, 157 N.W.2d 619 (1968) stands for the proposition that the immunity statute precludes *all* suits against a municipality for the intentional torts of its employees and thus, a plaintiff cannot accomplish indirectly through the indemnity statute what the plaintiff cannot accomplish directly due to the immunity statute.[1]

In light of Wisconsin Supreme Court pronouncements, decisions of this court, and the historical context in which the Wisconsin indemnity and immunity statutes were enacted, we conclude that the immunity statute does not absolve the villages and

the police commission from indemnifying Mueller's estate.

The Wisconsin Supreme Court discussed the scope of the indemnity statute in *Ibrahim v. Samore*, 118 Wis.2d 720, 348 N.W.2d 554 (1984). In *Ibrahim*, the plaintiff brought a libel suit against a University of Wisconsin faculty member. The Wisconsin Supreme Court held that the trial court properly dismissed the plaintiff's libel suit because the plaintiff failed to comply with a Wisconsin statute requiring plaintiffs to notify the attorney general within 120 days of an alleged injury caused by a state employee. *Id.* at 728–29, 348 N.W.2d at 559. The Supreme Court's holding reversed the decision of the Wisconsin Court of Appeals. The appellate court held that the plaintiff did not have to comply with the 120 day notice requirement because the plaintiff's complaint alleged malicious, willful and intentional misconduct. The Supreme Court disagreed, concluding that the 120 day notice requirement applied to intentional torts because the purpose of the notice statute "is to permit the attorney general to investigate a claim against an employee which might result in a judgment to be paid by the state under the indemnity statute, sec. 895.46." *Id.* at 727, 348 N.W.2d at 558. In dictum, the Supreme Court stated that under the indemnity statute, "[u]nlike the defense of official immunity, but like notice of injury, *no distinction is made as to judgments based on intentional or negligent conduct.*" *Id.* at 728, 348 N.W.2d at 559 (emphasis added).

The defendants contend that *Ibrahim* is inapposite because *Ibrahim* involved a state rather than a municipal employee. We disagree. While the holding of *Ibrahim* is inapposite—our case does not involve Wisconsin's 120 day notice statute— the Wisconsin Supreme Court clearly indicated in dictum that the Wisconsin indemnity statute does not distinguish between intentional and nonintentional torts in determining whether a public official or em-

---

1. Graham contends that the villages and the police commission failed to preserve the argument that they are not required to indemnify Mueller's estate by reason of the immunity statute. We disagree. The defendants timely raised this argument before the district court and the district court discussed the merits of the argument. Thus, we will decide the issue on appeal.

ployee qualifies for indemnification. We see no reason why the Supreme Court's pronouncement is dependent on whether an intentional tort is committed by a state as opposed to a municipal employee. The indemnity statute treats municipal employees no differently than state employees. The statute plainly says that judgments "shall be paid by the *state or political subdivision* of which the defendant is an officer or employe." Wis.Stat. § 895.46(1)(a) (emphasis added).

In *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir.1984), a case closely analogous to ours, this court required a Wisconsin municipality to indemnify employees who had committed intentional torts. The plaintiff in *Bell* brought a civil rights action against a police officer who intentionally shot and killed the plaintiff's son. The plaintiff also sued high ranking city officials who concealed facts pertaining to the killing. *Id.* at 1224. We held that the district court correctly determined that the city of Milwaukee was required to indemnify the police officer and the city officials for the compensatory and punitive damages awarded against them. *Id.* at 1271–72.

During the *Bell* appeal, the city conceded that the Wisconsin indemnity statute required it to indemnify the police officer and the public officials. Because of the city's concession, the villages and the police commission argue that we should not give *Bell* precedential effect in deciding this case. However, the city did contest a portion of the indemnity award in *Bell*. Specifically, the city argued that it was not required to indemnify the police officer and city officials for the punitive damages awarded against them because a municipality is immune from punitive damages in a federal civil rights suit. *Id.* at 1270. Although the city's challenge in *Bell* was based on different grounds than those proffered by the defendants in this case, what we said in response to the city's challenge is pertinent to the case at hand. In *Bell*, we acknowledged that municipalities are immune from punitive damages in federal civil rights suits. Nonetheless, we also pointed out that a state indemnity statute may waive

municipal immunity for punitive damages. *Id.* at 1271 (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 269, 101 S.Ct. 2748, 2761 n. 30, 69 L.Ed.2d 616 (1981)). After recognizing that some state indemnity statutes preclude indemnification for malicious or wilful employee misconduct, we stated that, "Wisconsin does not so limit its indemnification law." We stated that the Wisconsin indemnity statute applied "to all 'judgments,' no distinctions being made for compensatory versus punitive damages." *Id.* We concluded that regardless of the willfulness of the conduct at issue, Wisconsin's indemnity statute was a state-created rule shifting liability to municipalities for punitive damage awards against their employees. *Id.*

In another case involving the Wisconsin indemnity statute, we held that municipal employees who had committed intentional torts acted "within the scope of their employment," and thus, they were entitled to indemnification under the statute. *Hibma v. Odegaard*, 769 F.2d 1147 (7th Cir.1985). In *Hibma*, the plaintiff brought a § 1983 suit against three Sawyer County deputy sheriffs who had framed the plaintiff for a series of burglaries the sheriffs committed. The jury found that Sawyer County was required to indemnify the sheriffs because they were acting within the scope of employment when they took acts to frame the plaintiff. The district court granted Sawyer County's motion for judgment notwithstanding the verdict because it found that the sheriffs were not acting within the scope of their employment as that term is used in the Wisconsin indemnity statute. *Id.* at 1150–51. On appeal, we reversed the judgment notwithstanding the verdict and reinstated the jury's finding. *Id.* at 1153. Citing *Ibrahim* for the proposition that the Wisconsin indemnity statute does not distinguish between intentional and negligent conduct, we reasoned that the sheriffs' conduct fell within the scope of their employment, and thus, within the scope of the indemnity statute, even though the sheriffs' acts were intentional, improper, and lacking good faith. *Id.* at 1152.

In both *Bell* and *Hibma*, we held that the Wisconsin indemnity statute required municipalities to indemnify employees who had committed intentional torts. The villages and the police commission argue that neither *Bell* nor *Hibma* are dispositive because the municipalities in those cases failed to argue that the indemnity statute does not cover intentional tort actions due to the Wisconsin immunity statute—the statute prohibiting suits against a municipality for the intentional torts of its employees. Neither *Bell* nor *Hibma* grappled with the issue of how the immunity statute affects the indemnity statute. Rather, this court in *Bell* and *Hibma*, like the Wisconsin Supreme Court in *Ibrahim*, determined that the indemnity statute applied to intentional tort actions because of the plain language of the statute—the statute states that indemnity is proper in "any action" as long as the state or municipal employee was acting within the scope of employment. The defendants' argument does not affect the conclusion of *Ibrahim, Bell* or *Hibma*. By looking at the historical context in which the indemnity statute and the immunity statute were enacted, it becomes clear that the Wisconsin legislature did not intend the immunity statute to create an intentional tort exception to the indemnity statute.

The Wisconsin indemnity statute was originally enacted in 1943. In its original form, the statute read:

> Where the defendant in any action, writ, or special proceeding, except in actions for false arrest, is a public officer and is proceeded against in his official capacity and the jury or the court finds that he acted in good faith the judgment as to damages and costs entered against the officer shall be paid by the state or political subdivision of which he is an officer.

Wis.Stat. § 270.58 (1943). When the indemnity statute was enacted in 1943, the state of Wisconsin and its municipalities were protected against all direct tort suits, whether for negligent or intentional torts, by the common law doctrine of government tort immunity. Thus, while municipalities were immune from *direct* suit and *direct* liability for the torts of their employees, the Wisconsin legislature nonetheless required municipalities to pay judgments entered in suits brought directly against those employees. *See Larson v. Lester*, 259 Wis. 440, 49 N.W.2d 414 (1951) (indemnity statute requires municipality to indemnify police officer who intentionally shot victim as long as officer acted in good faith). The indemnity statute was not an attempt to transform any suit against a state employee into a direct suit against the state; rather, the purpose of the statute was gratuitously to shield state employees from monetary loss in tort suits they had become subject to because of their employment. *Cords v. Ehly*, 62 Wis.2d 31, 36–38, 214 N.W.2d 432, 435 (1974).

■ In the 1962 case of *Holytz v. Milwaukee*, 17 Wis.2d 26, 115 N.W.2d 618 (1962), the Wisconsin Supreme Court abolished the common law doctrine of government tort immunity. *See Fiala v. Voight*, 93 Wis.2d 337, 341, 286 N.W.2d 824, 827 n. 3 (1980). As a reaction to *Holytz*, the Wisconsin legislature enacted the municipal tort immunity statute in 1963.[2] *Strong*, 38 Wis.2d at 568–69, 157 N.W.2d at 622. In so doing, the legislature restored a portion of government tort immunity (for intentional torts by municipal employees) where full immunity once existed.[3] However, in restoring partial immunity against *direct* tort suits and *direct* liability, the legislature did not affect the scope of *indirect* state or municipal liability under the indemnity statute—the same statute in force when complete government tort immunity existed. In fact, since enacting the immunity statute in 1963, the Wisconsin legislature has

---

**2.** The statute was originally numbered Wis.Stat. § 895.43.

**3.** While abolishing the common law doctrine of government tort immunity, the Wisconsin Supreme Court in *Holytz* recognized that the Wisconsin legislature could reinstate government tort immunity if it so pleased. In *Holytz*, the Supreme Court said, "[i]f the legislature deems it better public policy, it is, of course, free to reinstate immunity." 17 Wis.2d at 40, 115 N.W.2d at 625.

amended the indemnity statute to make it easier for employees who have committed intentional torts to obtain indemnity. In 1973, the legislature deleted the requirement that a public officer or employee act in good faith in order to be indemnified. In place of the good faith requirement, the statute now requires an employee or public official to act "within the scope of employment." The statute's good faith requirement made it difficult, but not impossible, for an employee who committed an intentional tort to obtain indemnity. *See Larson*, 259 Wis. at 443–44, 49 N.W.2d at 416. Now an employee can act without good faith and still have acted within the scope of employment. *Hibma*, 769 F.2d at 1152. Thus, by changing the good faith requirement to a scope of employment requirement, the Wisconsin legislature has evidenced an intent to expand the indemnity statute to cover more intentional tort actions; the legislature has not evidenced an intent to eliminate intentional tort actions from the coverage of the indemnity statute.

The Wisconsin Supreme Court's decision in *Strong* does not lead to a contrary conclusion. In *Strong*, the plaintiff sued the city of Milwaukee claiming that one of its police officers wrongfully arrested and im-

prisoned him. The plaintiff, however, did not sue the officer. 38 Wis.2d at 568–69, 157 N.W.2d at 622. Instead, the plaintiff contended that the Wisconsin indemnity statute allowed him to recover directly against the city. The Supreme Court phrased the issue as follows: "Plaintiff also contends that even if false imprisonment is an intentional tort, an action can be maintained *directly* against the municipality since [the indemnity statute] requires political subdivisions to pay certain judgments taken against its officers and employees." *Id.* Because the plaintiff did not sue the arresting officer, there was no party for the city of Milwaukee to indemnify. The court in *Strong* held that the plaintiff was maintaining a *direct* suit against the city for an intentional tort of its employee, and thus, the suit was barred by the municipal tort immunity statute.[4] *Id.* Correctly understood, *Strong* stands for the proposition that the immunity statute bars *direct* suits against municipalities for the intentional torts of their employees.[5] *Strong* did not preclude the plaintiff from suing the officer directly and using the Wisconsin indemnity statute to *indirectly* recover from the city.[6] *See Shannon v. City of Milwaukee*, 94 Wis.2d 364, 371–75,

**4.** At the time of *Strong*, the immunity statute was numbered § 895.43. *See* Footnote 2, *supra*. Also, at the time of *Strong*, the indemnity statute (then numbered § 270.58) contained the "good faith" requirement rather than the "scope of employment" requirement.

**5.** The defendants raise Wisconsin's municipal tort immunity statute (Wis.Stat. § 893.80(1)) as a defense only to Graham's state law indemnification claim. Defendants recognize, however, that the immunity statute cannot be used as a defense to a federal civil rights claim. *See Felder v. Casey*, 487 U.S. 131, 138–53, 108 S.Ct. 2302, 2306–14, 101 L.Ed.2d 123 (1988) (failure to comply with the notice of claims procedure in Wis. Stat. § 893.80(1) cannot be used as a defense against a federal civil rights proceeding in state court). Accordingly, the defendants do not attempt to raise the immunity statute as a defense to Graham's § 1983 municipal liability suit against the villages of Sauk City and Prairie Du Sac—a suit arising out of Mueller's intentional tort against Graham.

**6.** In both *Baranowski v. City of Milwaukee*, 70 Wis.2d 684, 235 N.W.2d 279 (1975), and *Salerno*

*v. City of Racine*, 62 Wis.2d 243, 214 N.W.2d 446 (1974), the Wisconsin Supreme Court held that municipalities were immune from suit for the intentional torts of their employees. In both *Salerno* and *Baranowski*, unlike *Strong*, the plaintiff sued the municipal employee along with the municipality. In *Salerno*, the plaintiff's complaint alleged causes of action for a police officer's assault and battery. However, the plaintiff did not assert an indemnity claim against the city nor did the police officer cross-claim for indemnification. 62 Wis.2d at 244–47, 214 N.W.2d at 447–48. In *Baranowski*, the plaintiff sued two police officers and the City of Milwaukee for the officers' unlawful forcible entry and physical attack upon the plaintiff. Again, the plaintiff did not assert an indemnity claim against the city nor did the police officers cross-claim for indemnification. 70 Wis.2d at 686–89, 235 N.W.2d at 280–81. In both *Salerno* and *Baranowski*, as in *Strong*, the claim of liability was not based on indemnification; rather, it was based on direct liability for the intentional torts of municipal employees. In both cases, the Wisconsin Supreme Court held that the municipal tort immunity statute shielded the municipalities from direct liability for the intentional torts of their employees.

289 N.W.2d 564, 569–70 (1980) (legislative intent in enacting indemnity statute is that public employees should be indemnified by their government employer even where employer itself is protected from direct liability).

The villages and the police commission mount a second challenge to the district court's indemnity order. They contend that even if the immunity statute does not preclude indemnification, the district court erred in ordering indemnity at the summary judgment stage because a trier of fact could conclude that Officer Mueller did not act "within the scope of his employment" when he shot John Graham.

■ As a threshold matter, we note all parties agree that when Mueller shot Graham, he was acting under color of law for purposes of § 1983 liability. However, a finding that a public employee acted under "color of law" for purposes of § 1983 does not automatically establish that the employee acted within the "scope of employment" under the Wisconsin indemnity statute. The "under color of law" category is broader than the "scope of employment" category. *Cameron v. City of Milwaukee*, 102 Wis.2d 448, 457–58, 307 N.W.2d 164, 169 (1981); *Weber v. City of Cedarburg*, 125 Wis.2d 22, 26, 370 N.W.2d 791, 793 (Wis.Ct.App.1985), *aff'd*, 129 Wis.2d 57, 384 N.W.2d 333 (1986). Thus, while Mueller unquestionably acted under color of law when he shot Graham, this does not necessarily mean that it was proper to grant summary judgment regarding the scope of employment issue.

Wisconsin courts have stated that an act is deemed to be within the scope of employment only if it is a natural, not disconnected and not extraordinary, part or incident of the service contemplated, *Cameron*, 102 Wis.2d at 456, 307 N.W.2d at 168; *Desotelle v. Continental Casualty Co.*, 136 Wis.2d 13, 26, 400 N.W.2d 524, 529 (Wis.Ct. App.1986), or if it is closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that it may be regarded as a method, even though an improper one, of carrying out the objects of the employment. *Cameron*, 102

Wis.2d at 455–59, 307 N.W.2d at 168–69. Most recently, the Wisconsin Supreme Court stated that, in resolving the scope of employment issue, an employee must be motivated, at least in part, by a purpose to serve his employer. *Olson v. Connerly*, 156 Wis.2d 488, 457 N.W.2d 479, 482–83 (1990). However,

> [t]here is no requirement that serving the employer must be the employee's only purpose or even the employee's primary purpose. Rather, an employee's conduct is not within the scope of his or her employment if it is too little actuated by a purpose to serve the employer or if it is motivated entirely by the employee's own purposes (that is, the employee stepped aside from the prosecution of the employer's business to accomplish an independent purpose of his or her own).

*Id.* at 499–500, 457 N.W.2d at 483.

Wisconsin courts have stated that it is proper to decide the scope of employment issue on a motion for summary judgment as long as the underlying facts are not in dispute and reasonable inferences leading to conflicting results cannot be drawn from the undisputed facts. *Cameron*, 102 Wis.2d at 457–60, 307 N.W.2d at 169–70; *Desotelle*, 136 Wis.2d at 26–28, 400 N.W.2d at 529. The defendants argue that an affidavit submitted by Police Chief Rentmeester provided sufficient evidence to preclude summary judgment. Rentmeester's affidavit stated that (1) the Sauk Prairie Police Commission did not teach police officers to use deadly force unless an officer's or another individual's life was at risk and (2) it is not a department objective to deprive an arrestee of an opportunity to appear and defend himself in any subsequent criminal proceeding. The defendants contend that Rentmeester's affidavit would allow a jury reasonably to conclude that Officer Mueller's shooting of a handcuffed, unresisting arrestee who posed no threat to Mueller or any other person was an act that is disconnected or extraordinary in terms of a police officer's normal duties. Defendants also argue that the affidavit would have allowed a jury to reasonably conclude that Mueller did not use a method, even an

improper one, of carrying out his employment objectives.

The defendants rely on *Cameron* and *Desotelle* to support their position. In *Cameron*, two off-duty police officers and an off-duty fireman (defendants) were cruising the streets of Milwaukee during the early morning hours. All three were dressed in civilian clothes. Although they were off-duty, the two police officers were subject to a Milwaukee Police Department regulation requiring them to take "required police action in any manner ... at any time." The plaintiffs, all of whom were black, were in a car traveling behind the defendants' automobile. The defendants started to heckle the plaintiffs and continuously referred to them as "niggers." Upon reaching an intersection, one of the defendants said, "so you niggers caught us, do you want to fight?" The defendants then got out of their vehicle and became involved in a street fight. After the fight ensued, two of the defendants identified themselves as police officers; one of them then produced his gun and ordered the plaintiffs not to move. Uniformed police officers arrived on the scene and took the plaintiffs into custody. None of the three defendants were taken into custody. 102 Wis.2d at 452, 307 N.W.2d at 166.

In the plaintiffs' § 1983 suit against the defendants, a federal court found that the defendants acted under color of law and thus, they violated the plaintiffs' constitutional rights. *Id.* at 452–54, 307 N.W.2d at 166–67. The defendants subsequently filed a suit for indemnity in a Wisconsin court. The trial court granted summary judgment in favor of the city holding that the defendants clearly were not acting within the scope of their employment at the time of the altercation. *Id.* The Wisconsin Supreme Court reversed. The Supreme Court held that summary judgment was improper because a trier of fact could reasonably conclude that the defendants were acting within the scope of their employment—or that they were not. *Id.* at 459–60, 307 Wis.2d at 170.

In *Desotelle,* a Brown County sheriff's deputy in full uniform and on regular patrol duty suspected a young female (plaintiff) of underage drinking. The deputy removed the plaintiff to his squad car for "questioning." While in the squad car, the deputy sexually assaulted the plaintiff. 136 Wis.2d at 18, 400 N.W.2d at 525. After a federal jury determined that the deputy acted under color of law and was liable to the plaintiff for violating her constitutional rights, the plaintiff filed a suit in state court to require Brown County to indemnify the deputy for the judgment entered against him. The state trial court impaneled an advisory jury to determine whether the deputy acted within the "scope of employment" when he sexually assaulted the plaintiff. The jury found that the deputy did not act within the scope of his employment. *Id.* at 20, 400 N.W.2d at 526. On appeal, the plaintiff argued that the trial court should have held that the deputy acted within the scope of employment as a matter of law. The court of appeals disagreed, reasoning that a trier of fact could have reasonably concluded that the deputy's conduct was so extraordinary and disconnected from the type of services contemplated that it was done outside the scope of his employment. *Id.* at 26–30, 400 N.W.2d at 529–30.

A trier of fact could clearly draw competing conclusions from the undisputed facts of *Cameron.* One such conclusion is that the off-duty officers were out flexing their muscles when they started the brawl and thus, they were outside of the scope of their employment. A competing conclusion, based on the department regulation, would place the officers "on-duty" upon being confronted by a situation (a brawl) requiring "police action." The undisputed facts of *Desotelle* also permit inferences leading to opposite, but reasonable, conclusions. A jury could reasonably conclude that the deputy's "investigation" of underage drinking was a mere pretext to further his own objective of sexual gratification and thus, the sexual assault was wholly disconnected from the performance of his ordinary duties. Alternatively, a jury could reasonably conclude that the deputy's

investigation of underage drinking was an activity for which he was hired and the sexual assault was made possible only by virtue of his status as a police officer.

■ We believe that this case is distinguishable from *Cameron* and *Desotelle.* If a jury could have inferred that Mueller shot Graham because of some private feud between them, a jury might reasonably conclude that Mueller was acting solely for his personal benefit (like the deputy in *Desotelle*) and thus, he acted outside the scope of his employment. *See Connerly,* 457 N.W.2d at 484. However, the facts do not suggest any private connection between Mueller and Graham. Likewise, if Mueller shot Graham while he was off-duty cruising the streets and instigating fights with motorists and pedestrians (like the defendants in *Cameron*), a jury might reasonably conclude that he acted outside the scope of his employment. However, at the time Mueller shot and killed Graham, he was an on-duty, uniformed police officer. Moments prior to the fateful event, he was operating a patrol car in his jurisdiction. Mueller pursued Graham only as a result of a call for assistance he received over his patrol car radio. Arriving at Graham's residence, Mueller and a conservation warden assisted each other in handcuffing Graham moments before Mueller shot him in the head. Given these facts, we do not believe a jury could reasonably conclude that Mueller's conduct was "too little actuated by a purpose to serve [his] employer" or that his conduct was "motivated entirely by [his] own purposes." *Connerly,* 457 N.W.2d at 483.

This case appears to resemble the district court proceedings in *Bell v. City of Milwaukee,* 536 F.Supp. 462 (E.D.Wis.1982), *aff'd in part, rev'd in part,* 746 F.2d 1205 (7th Cir.1984) more closely than it resembles either *Cameron* or *Desotelle.* In *Bell,* the City of Milwaukee contended that it was not required to indemnify a police officer who shot and killed a fleeing victim and subsequently covered up facts pertaining

to the shooting. The city argued that the officer acted outside the scope of employment because he knowingly lied to police officials during the investigation of the shooting and perjured himself during the inquest. *Id.* at 477. Without submitting the "scope of employment" issue to a jury, the district court held that the city was required to indemnify the officer. The court stated that the officer's actions during the chase and shooting of the plaintiff and during the subsequent investigation were *unquestionably* within the scope of his employment because the duties of a police officer include participation in investigations, reporting to superiors, and giving testimony at court hearings. *Id.* Citing *Cameron,* the court concluded that the officer unquestionably acted within the scope of his employment because he merely used improper methods of carrying out his duties as a police officer. *Id.* at 478.[7]

Rentmeester's affidavit merely establishes that Mueller's use of deadly force was improper under the circumstances; the affidavit does not establish that Mueller's shooting was disconnected from the type of services ordinarily contemplated by a police officer. Our focus must be on the nature of the services contemplated, not the outcome of the employee's acts. The use of deadly force incidental to arrest is a recognized and accepted tool of policing. Merely because Mueller misused his authority to use deadly force in apprehending Graham does not put him outside of the scope of his employment. A logical application of a rule focusing on outcome is that *any* unauthorized use of deadly force by a police officer is outside the scope of employment. Here, as in *Bell,* Mueller's shooting was unquestionably a method, even though quite an improper one, of carrying out the objects of his employment. *See Hibma,* 769 F.2d at 1153 (employees acted within scope of employment in performing duties as deputy sheriffs even though they used improper methods of carrying out those duties). We agree with the district court that the only reasonable inferences that

7. This court did not address the "scope of employment" issue on appeal. *See Bell v. City of* *Milwaukee,* 746 F.2d 1205 (7th Cir.1984).

can be drawn from the undisputed facts lead to the conclusion that Mueller was acting within the scope of his employment when he shot Graham.

### Municipal Liability

In addition to her claim against Mueller, Crystal Graham brought a § 1983 claim against the Villages of Sauk City and Prairie Du Sac, the Sauk Prairie Police Commission and police chief Robert Rentmeester, alleging that these defendants were directly liable for Mueller's unconstitutional killing of John Graham. Graham contends that the defendants are liable under § 1983 because in hiring, supervising, and retaining Mueller, they failed to conduct an adequate investigation into Mueller's background—an investigation that would have revealed Mueller was unfit to use or carry a firearm. It is undisputed that at the time Mueller shot Graham, Mueller was suffering from an acute exacerbation of a condition known as "schizophrenia, chronic paranoid reaction." The acute exacerbation resulted from Mueller's failure to comply with the prescribed use of his medication; this in turn caused Mueller's thoughts to become disorganized, caused him to have delusions about being threatened and resulted in periods of agitation. At the time he shot Graham, Mueller had become psychotic, lost contact with reality and was incapable of exercising reasonable judgment in the use of his weapon. The district court rejected Graham's claim that the villages, the police commission, and Rentmeester directly violated Graham's constitutional rights and granted summary judgment in their favor. In her cross-appeal, Graham contests the grant of summary judgment.

Whether the district court properly granted summary judgment on the issue of municipal liability is a determination that is heavily dependent upon the facts of this case; thus, a rather detailed examination of the facts is in order. John Mueller was one of approximately 40 people who applied for an opening with the Sauk Prairie Police

Commission in 1983. Mueller submitted an application which indicated that he was previously employed by the Mazomanie, Wisconsin, Police Department as the chief of police and by the Village of Hazel Green, Wisconsin, as the chief of police. Although not indicated on his application, Mueller had also worked for the Dane County Sheriff's Department as a police officer and with the Jefferson County Sheriff's Department as a police officer.

The defendants required Mueller to take a written examination administered by the Wisconsin City–County Testing Bureau. Mueller's written examination score ranked him tenth among all candidates vying for the position. Mueller and fifteen other candidates then began a two-step interview process. Mueller's first interview was with a panel of three law enforcement officers from various law enforcement agencies; his next interview was with a citizens' panel composed of three members of the Sauk City–Prairie Du Sac community. The candidates with top ten combined written and oral scores—which included Mueller—were then interviewed by the Sauk Prairie Police Commission. During Mueller's interview with the commission, he was asked about an acknowledgement on his application that he was once "treated for stress." Mueller indicated that the stress resulted from the death of his son and a divorce he was going through at the time. Rentmeester and the commission were satisfied with that explanation. After Mueller ultimately emerged as the highest ranked candidate, the commission instructed Rentmeester to offer Mueller the position as long as the investigation into Mueller's background did not reveal anything that would disqualify him.

At the outset of the hiring process, Rentmeester requested each candidate, including Mueller, to undergo a physical examination. Dr. Burr Eichelmann of the Veteran's Administration Hospital examined Mueller and prepared a note of the examination indicating that Mueller was medically fit for the police officer position.[8] Rent-

---

**8.** Graham contends that a material issue of fact exists as to whether Dr. Eichelmann notified the

defendants that Mueller was fit for police employment. Rentmeester claims that he received

meester also required Mueller to execute an "Authorization for Release of Information," empowering the commission to obtain information or records from any clinic, sanitarium or hospital where Mueller had been treated for injuries or illnesses (physical and/or mental in nature).

After narrowing the pool of applicants to ten finalists, Rentmeester requested the Sauk County Sheriff's Department to provide a driver's license report, a National Crime Information Center (NCIC) report, and a Wisconsin Crime Information Bureau (CIB) report for each candidate. Mueller's driver's license report indicated that he had no traffic violations on his record and that there were no outstanding warrants for his arrest. The sheriff's department did not furnish Rentmeester with either a CIB report or a complete NCIC report regarding Mueller.

Rentmeester continued the investigation into Mueller's background after Mueller began working as a police officer with the defendants in April of 1983.[9] Rentmeester contacted two of Mueller's former employers, Chief Deputy Stanley Klein and Captain Richard Josephson of the Dane County Sheriff's Department. Although Mueller failed to list the Dane County Sheriff's Department as a former employer and either Klein or Josephson as references, both supplied positive reports about Mueller. Josephson told Rentmeester that Mueller had always acted in a professional manner; Klein told Rentmeester that he knew of nothing which would make him reluctant to hire Mueller as a police officer. Mueller also failed to indicate that he had worked for the Jefferson County Sheriff's Depart-

ment. However, Rentmeester spoke to Jefferson County Sheriff Keith Mueller (John Mueller's uncle) who told Rentmeester that Mueller had done an excellent job while working for the Jefferson County Sheriff's Department. Keith Mueller stated that he had no reason to believe Mueller would not be a good police officer.

Rentmeester also spoke to John Trager, a businessman in the Mazomanie community, where Mueller was the former chief of police. Trager told Rentmeester that he was personally familiar with Mueller and that he knew of nothing that should preclude Mueller from working as a police officer. Finally, Rentmeester spoke to John Mueller's brother, Wayne. Although Wayne was aware of John Mueller's history of mental problems, he conveyed none of this to Rentmeester. In fact, Wayne told Rentmeester that he knew of nothing which would indicate that Mueller would not make a good police officer.

In November, 1983, a few months after he began working for the defendants, Mueller was hospitalized at the Veteran's Administration Hospital for a period of eight days. Mueller informed Rentmeester that the hospitalization was due to an adverse reaction to medication he was taking. The police commission instructed Rentmeester to obtain a letter from Mueller's treating physician indicating that Mueller was fit to return to work as a police officer. Before Mueller returned to work, Rentmeester spoke to Mueller's treating physician, Dr. Eichelmann. Dr. Eichelmann informed Rentmeester that Mueller had been unable to sleep and suffered from

a telephone call from Dr. Eichelmann's secretary, who informed him that Mueller had been given a physical examination on April 1, 1983. However, Dr. Eichelmann's records do not show that he examined Mueller on April 1, 1983. Whether or not Dr. Eichelmann examined Mueller on April 1, 1983, it is undisputed that Dr. Eichelmann examined Mueller on January 13, 1983—three weeks before Mueller applied for the police officer position with the defendants— and prepared a note stating that Mueller was fit for police work. Thus, Graham's objections regarding the alleged April examination do not put into dispute the fact that Dr. Eichelmann examined Mueller and represented that Mueller was fit for police work. In addition, while

Mueller may not have undergone an examination at the request of the defendants, this does not put into dispute the fact that the defendants have a policy of requiring all applicants to undergo a physical examination.

9. At the time Mueller was hired, the Sauk Prairie Police Commission had a practice of hiring police applicants before completing the investigation into an applicant's background. At Rentmeester's request, the commission changed this practice subsequent to Graham's death and now conducts the entire background investigation before hiring an applicant.

an "imbalance of medication from stress." Rentmeester did not ask Dr. Eichelmann what type of medication caused the problem because in Rentmeester's words, he did not "feel that it was that important for [him] to know what [Mueller] was taking as long as the doctor told [him] that [Mueller] was capable of performing his duties." Dr. Eichelmann provided a letter indicating that Mueller was fit to return to work.

Following his hospitalization, Mueller continued to work as a police officer for approximately three years without incident. Neither Rentmeester nor any members of the Sauk Prairie Police Department received any complaints about Mueller's conduct up to the time Mueller shot John Graham.

During the morning of September 16, 1986, the day Mueller shot Graham, Mueller's fiancee thought that Mueller was acting somewhat out of character. Later that day, she received a telephone call from Mueller. Disturbed by the call, Mueller's fiancee telephoned the Sauk Prairie Police Department and asked the department secretary to check whether Mueller was all right. The secretary radioed Mueller in his police vehicle and instructed him to go to Rentmeester's home with a message to have Rentmeester call the department. Rentmeester was at home, tearing down his garage; he and Mueller spent about ten minutes talking mostly about that project. Rentmeester called the department shortly after Mueller left and told the secretary that he had observed nothing unusual about Mueller. Mueller himself believed that there was nothing about his appearance at Rentmeester's home which would have made either his stress or illness noticeable to Rentmeester. Mueller shot Graham later that afternoon.

In asking us to reverse the district court's grant of summary judgment, Crystal Graham argues that the defendants' failure to take certain steps in investigating Mueller's background could lead a fact finder to reasonably conclude that the defendants directly violated John Graham's constitutional rights. Specifically, Graham points out that Rentmeester failed to ob-

tain an NCIC report or a CIB report regarding Mueller. The Sauk County Sheriff's Department provided Rentmeester with only a driver's license report, which contains no information about a licensee's arrest or conviction record. If Rentmeester had obtained an NCIC or a CIB report, he would have learned that on January 1, 1982, Mueller was arrested by the Dane County Sheriff's Department for disorderly conduct. Graham reasons that if Rentmeester had been aware of Mueller's arrest, he could have reviewed the arrest record; had he done so, he would have been appraised that Mueller suffered from mental problems as of the time of the arrest—the arrest record contained a narrative of statements made by a Dr. Jense, who opined that Mueller suffered from mental problems. Dr. Jense stated that Mueller should be admitted to a mental ward rather than a medical ward and that she was prepared to get an emergency commitment to a mental ward.

Next, Graham argues that Rentmeester should have contacted Mueller's ex-wife. Mueller's ex-wife was aware of Mueller's mental illness and may have conveyed this to Rentmeester. In addition, Graham asserts that Rentmeester should have checked the records of Mueller's divorce. In those records, the guardian ad litem for Mueller's minor child expressed concern over Mueller's history of mental illness.

Graham also points out that, in hiring Mueller, the defendants failed to comply with certain provisions of the Wisconsin Administrative Code. Specifically, the defendants did not check police files in communities where Mueller had lived; they did not verify Mueller's employers' records; and they failed to obtain a "Report of Medical Examination" from Dr. Eichelmann after he had examined Mueller. Wis. Admin.Code § LES 2.01. Graham argues that if Rentmeester had obtained either a "Report of Medical Examination" or a "Report of Medical History" from Dr. Eichelmann, Rentmeester would have been appraised of the severity of Mueller's problem because those forms contain a section pertaining to psychiatric history.

Finally, Graham points to several steps the defendants could have taken to learn more about Mueller's medical history. First, Graham argues that the defendants too easily accepted Mueller's explanation that his past treatment for stress was due to his divorce and the death of his son. Graham argues that the defendants should have inquired further about the nature of that treatment and determined whether it was ongoing.

Second, Graham points out that Mueller completed a form for the Sauk Prairie Police Commission in which he stated he was regularly taking "chlorpromazine." Graham contends that Rentmeester should have made some effort to find out what type of condition chlorpromazine is commonly used to treat. Graham notes that a simple Webster's Dictionary check indicates that chlorpromazine is a synthetic drug used as a sedative, and experimentally, to control anxiety and agitation in certain kinds of mental illness.

Finally, Graham points out that the letter Dr. Eichelmann submitted to the defendants following Mueller's November 1983 stay in the Veteran's Hospital was signed by Dr. Eichelmann as "Chief, Psychiatry Service." Although Dr. Eichelmann assured Rentmeester that Mueller was able to return to work, Graham argues that Dr. Eichelmann's title should have caused Rentmeester to specifically ask Dr. Eichelmann whether Mueller was free from any mental condition which might adversely affect his performance as a police officer. In addition, Graham argues that Rentmeester should have used Mueller's "Authorization for Release of Information" to personally examine Mueller's medical records before allowing him to return to work.

In *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court departed from precedent and held that local units of government can be held directly liable for constitutional violations under § 1983. However, *Monell* expressly rejected vicarious liability as a basis for § 1983 claims against municipalities. On the contrary, official policy must have "caused" an employee to violate another's constitutional rights. *Id.* at 691–92, 98 S.Ct. at 2036. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037–38. It was not necessary for the Court in *Monell* to determine "what the full contours of municipal liability under § 1983 may be," *id.* at 695, 98 S.Ct. at 2038, for that case involved a challenge to a municipal policy of discharging pregnant employees irrespective of their medical needs—a policy that directly violated the pregnant employees' constitutional rights. Since *Monell,* the Court has made clear that a city will be liable under § 1983 if that city's deliberate policy or act directly violates a person's constitutional rights. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

On the other hand, the Court has struggled over the issue of municipal liability in cases such as ours where a non-policymaking official committed a constitutional violation and where no explicit city action or policy directly caused the violation. An example is *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). *Tuttle* dealt with a fatal shooting by a policeman. Municipal liability was urged on the basis that Oklahoma City failed to train its police officers adequately, the failure to train amounted to gross negligence or deliberate indifference to police misconduct, and consequently, the failure to train "caused" the killing. *Id.* at 812–13, 105 S.Ct. at 2430–31. A majority of the Court agreed that municipal liability under § 1983 could not be imposed by inferring the existence of city policy from a non-policymaking employee's single instance of misconduct. *Id.* at 823–24, 105 S.Ct. at 2436. However, the Court was unable to form a majority over the question of whether a municipality could

ever be liable for a "policy" of "inadequate training."

The plurality opinion characterized Oklahoma City's training policy as not itself unconstitutional—the city did not have a "custom" or "policy" of authorizing its police officers to use excessive force in the apprehension of suspects. *Id.* at 820, 105 S.Ct. at 2434. The plurality stated that in a case such as *Monell*, where the policy was itself unconstitutional, only one application of the policy is necessary for a municipality to be liable for a constitutional violation resulting from its official policy. The plurality suggested that "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.* at 824, 105 S.Ct. at 2436 (footnotes omitted). Noting that the alleged inadequate training "policy" at issue in *Tuttle* is far more nebulous and a good deal further removed from the constitutional violation than was the policy in *Monell*, the plurality expressed no opinion on whether a policy that is not itself unconstitutional can ever meet the liability requirements of *Monell*. *Id.* n. 7.

Three years later, the Court resolved the question left open in *Tuttle* by holding that under certain limited circumstances, a municipality can be liable for constitutional violations resulting from its failure to train municipal employees. *City of Canton, Ohio v. Harris*, 489 U.S. 378, ——, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). In *Canton*, the Court rejected the contention that a municipality can be held liable under § 1983 only if a municipal policy is itself unconstitutional. However, in so holding, the Court formulated a stringent standard for plaintiffs to satisfy in order to establish municipal liability. The Court stated that the inadequate police training alleged in *Canton* may serve as a basis for § 1983 liability only if the failure to train

amounts to "deliberate indifference" to the rights of persons with whom the police come into contact. *Id.* The Court remanded the case because the standard of proof the district court imposed on the plaintiff—that of gross negligence or recklessness—was a "lesser one" than the "deliberate indifference" standard. *Id.* at ——, 109 S.Ct. at 1207. The Court reasoned that the "deliberate indifference" standard was most consistent with its previous declarations that a municipality can be liable under § 1983 only if its policies are the moving force behind a constitutional violation. *Id.* at ——, 109 S.Ct. at 1204–05.

The constitutional violation here, as in *Canton*, was committed by a non-policy-making official (Mueller). In addition, this case, like *Canton*, does not involve an explicit city action or policy that directly violates constitutional rights. The defendants' hiring procedure consists of a written examination, interviews, medical examinations and certain pre-employment and post-employment background checks. The defendants also have a policy of requiring a hospitalized employee to obtain a letter from his or her physician stating that the employee is capable of returning to work. Clearly, these procedures do not directly violate any constitutional guarantees.

Like the plaintiff in *Canton*, Graham bases her § 1983 municipal liability claim solely on the defendants' allegedly inadequate acts as "policy." Accordingly, the standard of fault and the principles which applied to the claim of inadequate training in *Canton* must guide our determination of municipal liability in this case. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1522 (7th Cir.1990) (applying *Canton's* deliberate indifference standard to claims of inadequate procedure for recovery of dangerous weapons and inadequate supervision); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir.1989) (applying *Canton's* deliberate indifference standard to claim of inadequate supervision).[10]

---

**10.** *Gibson v. City of Chicago*, 910 F.2d 1510 (7th Cir.1990) involved a fatal shooting by a Chicago police officer shortly after that officer had been placed on the police department's medical roll

as mentally unfit for duty. Plaintiff's decedent brought a § 1983 claim against the police officer for the shooting. In addition, the plaintiff brought a municipal liability claim under

In *Canton*, the Court set forth certain principles to help expand upon the meaning of the "deliberate indifference" standard of fault. For instance, the Court stated that:

it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is *so obvious, and the inadequacy so likely to result in the violation of constitutional rights*, that the policymakers' of the city can reasonably be said to have been deliberately indifferent to the need.

489 U.S. at ——, 109 S.Ct. at 1205 (emphasis added). In addition, the Court made clear that it will not:

suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.

*Id.* at ——, 109 S.Ct. at 1206.

Applying the principles of *Canton*, we must determine whether the district court properly granted the defendants' motion for summary judgment on Graham's municipal liability claim.[11] We review the district court's decision to grant summary judgment *de novo*, applying the same standard as employed by the district court. *McMillian v. Svetanoff,* 878 F.2d 186, 188 (7th Cir.1989); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1329 (7th Cir.1989). We will affirm the grant of summary judgment if there is no genuine issue of material fact and the defendants are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In order to prevail, Graham must demonstrate that under the "deliberate indifference" standard of *Canton,* there is sufficient evidence to support a jury verdict in her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Applying the

§ 1983 asserting that the acting superintendent of police (in his official capacity) and the City of Chicago had failed to promulgate adequate procedures to recover firearms and ammunition from police officers who had been placed on medical leave due to mental illness; plaintiff also asserted a claim against the superintendent in his individual capacity for inadequate supervision. 910 F.2d at 1513.

Pursuant to Fed.R.Civ.P. 12(b)(6), the city moved to dismiss the claim against the police officer on the ground that the officer was not acting under color of law when he shot the victim. The district court denied the motion to dismiss, but limited all discovery to the color of law issue. 910 F.2d at 1513–14. At the close of discovery, the district court granted summary judgment in favor of the city on the claim against the police officer on the ground that the officer did not act under color of law. Although the district court had limited discovery to the color of law issue, the court also granted summary judgment in favor of the city and the police superintendent on the plaintiff's municipal liability claims. 910 F.2d at 1514–16.

On appeal, we reversed the grant of summary judgment on the municipal liability claims. 910 F.2d at 1519–20. Because no discovery had been allowed on the municipal liability issue, we held that the district court erred in assessing the municipal liability claims under summary judgment standards rather than under the standards applicable to a judgment on the pleadings under Fed.R.Civ.P. 12(b)(6). We then limited our review of the municipal liability claims to a determination of whether those claims could survive a motion to dismiss under Rule 12(b)(6) —that is, accepting all of the plaintiff's factual allegations as true, whether plaintiff had alleged any set of facts upon which relief may be granted. We concluded that the plaintiff had pleaded sufficient facts to survive a motion to dismiss. 910 F.2d at 1520–23.

Noting that the purpose of a motion to dismiss was to test the sufficiency of the complaint and not the merits, we expressly declined to offer an opinion as to the underlying merits of the municipal liability claims. However, we did note that the municipal liability claims were to be tested under *Canton's* deliberate indifference standard and that this standard of liability was "rigorous." 910 F.2d at 1522.

11. The defendants do not dispute that they are responsible for establishing policies and procedures with respect to hiring, supervising, and retaining police officers. Thus, it is undisputed that municipal liability *may* attach to these defendants because of their investigation into Mueller's background. *See Pembaur v. Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1300 n. 12, 89 L.Ed.2d 452 (1986) (municipal liability may attach where officials who make employment decisions are responsible for establishing employment policy). The issue we must decide is whether Graham can prove that the defendants' investigation *caused* the constitutional violation in this case.

principles of *Canton,* we conclude that the district court properly granted summary judgment in favor of the defendants.[12]

 In light of the information the defendants gathered about Mueller from Mueller's former employers and from Dr. Eichelmann, we do not believe a jury could reasonably conclude that the need for further investigation into Mueller's background was so obvious and the lack of further investigation so likely to result in the violation of constitutional rights, that the defendants were deliberately indifferent to the rights of the citizens of Prairie Du Sac and Sauk City. Graham's argument consists of pointing out specific steps that she contends the defendants should have taken to discover more about Mueller. As the Court stated in *Canton,* however, merely because a § 1983 plaintiff can point to something a city could have done to prevent the unfortunate incident does not condemn the procedures the city did undertake as deliberately indifferent. 489 U.S. at ——, 109 S.Ct. at 1206. This is such a case.

Mueller's application and resume revealed that he had extensive experience in the field of law enforcement, serving as the chief of police for two different police departments and as a police officer in two other police departments. During all times that Mueller served as a law enforcement officer with those four different police departments, he suffered from the same psychological affliction that he suffered from at the time he shot Graham; in addition, he was being treated with the same medication that he was taking at the time he shot Graham. Nonetheless, none of the law enforcement officials that Rentmeester contacted professed to have any knowledge of why Mueller should not be a police officer. Perhaps these references did not know of Mueller's psychological problems

because Mueller was never involved in an incident that would have revealed his problems to them. On the other hand, they may have known about Mueller's problems but did not think they would affect his performance as a police officer. Either way, the relevant fact for our purpose is that Rentmeester contacted persons who had worked with Mueller and who were in a good position to inform Rentmeester of any condition, psychological or otherwise, that would affect Mueller's performance as a police officer.

Finally, Rentmeester contacted Mueller's brother, Wayne, who did know of Mueller's psychological problems. Although Wayne was in a position to relate how he thought those problems might affect Mueller's performance as a police officer, he never mentioned Mueller's psychological problems to Rentmeester. In light of the fact that Rentmeester contacted several persons who were in a position to know how Mueller would perform as a police officer, we do not see how Rentmeester's failure to contact Mueller's ex-wife amounts to evidence of deliberate indifference. The fact that Mueller's psychological problems were not reported to Rentmeester does not change the fact that he conducted an investigation which should have revealed any serious problem that might affect Mueller's performance as a police officer.

Graham makes much of the fact that the defendants failed to obtain a "Report of Medical Examination" from Dr. Eichelmann as required by the Wisconsin Administrative Code. It is well established, however, that a violation of state law is not synonymous with a violation of the constitution. *Davis v. Scherer,* 468 U.S. 183, 193–96, 104 S.Ct. 3012, 3018–20, 82 L.Ed.2d 139 (1984); *Snowden v. Hughes,* 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944); *Archie v. City of Racine,* 847 F.2d 1211,

---

12. The district court granted the defendants' motion for summary judgment before the Supreme Court rendered its decision in *Canton.* Nonetheless, the district court clearly rejected Graham's argument that something less than "deliberate indifference" was required in this case. In granting the defendants' motion, the district court concluded that, "the undisputed

facts do not support the reasonable inference of deliberate indifference necessary to survive a motion for summary judgment." Graham does not argue that the district court applied an incorrect standard; rather, she simply argues that the district court erred in not finding "deliberate indifference" under the facts of this case.

1217 (7th Cir.1988) (*en banc* ), *cert. denied,* — U.S. ——, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989); *Kasper v. Board of Election Commissioners,* 814 F.2d 332, 342 (7th Cir. 1987). In light of Dr. Eichelmann's assurance that Mueller was medically fit for employment, we do not believe that Rentmeester's failure to conduct a further investigation into Mueller's medical background is evidence of deliberate indifference. It was justifiable for Rentmeester to assume that Dr. Eichelmann checked Mueller's medical history; that Dr. Eichelmann would discover any psychological problems Mueller suffered from; that Dr. Eichelmann took those problems into account in concluding that Mueller was fit for employment; that Dr. Eichelmann was familiar with the drug chlorpromazine and the condition it is used to treat; and that Dr. Eichelmann would inform Rentmeester if he believed that condition would affect Mueller's performance as a police officer.

Rentmeester was also justified in relying on Dr. Eichelmann's oral and written assurances that Mueller was able to return to work following his hospitalization in 1983. Dr. Eichelmann informed Rentmeester that Mueller was being treated merely for "an imbalance of medicine from stress." We do not see why Rentmeester should have believed it was necessary for him to conduct his own investigation into Mueller's ailment once he received this assurance from Dr. Eichelmann. More important, it is not clear to us why Rentmeester, as a layman, was in a position to evaluate Mueller's medical information and reach a conclusion different from Dr. Eichelmann's. In addition, there was no ongoing reason for Rentmeester to suspect that the condition which led to Mueller's hospitalization would in any way endanger the public—

Mueller returned to work for three years without incident or complaints after the 1983 hospitalization but before shooting John Graham.

■ Despite the fact that Mueller possessed a record unblemished by incident or citizen complaints, the defendants did not summarily dismiss a message from Mueller's fiancee that Mueller had acted strangely during the morning of the day he shot Graham. Rather, the police dispatcher directed Mueller to Rentmeester's house where Rentmeester was given an opportunity to observe Mueller. Mueller himself confirmed that he had not given Rentmeester any appearance of illness when the two had spoken together on that day. Because Rentmeester observed nothing abnormal about Mueller, we cannot say that Rentmeester's decision to allow Mueller to return to work evidences deliberate indifference to the rights of the citizens of the two villages.

■ Finally, the defendants' failure to obtain either a CIB or NCIC report is not critical under the circumstances of this case. These reports are merely one method that may have led the defendants to discover Mueller's psychological problems. The defendants' failure to utilize this method does not alter the fact that they took several steps that were just as likely to reveal Mueller's problems as were these reports. We agree with the Fifth Circuit's conclusion in *Stokes v. Bullins,* 844 F.2d 269, 275 (5th Cir.1988), that where a town conducts an otherwise adequate investigation into an applicant's background, the failure to perform an NCIC check should not be used as a talisman for indifference to constitutional rights.[13]

---

**13.** In *Stokes,* a citizen who was totally disabled by a police shooting brought a § 1983 action against a town based upon that town's alleged inadequate hiring procedures. 844 F.2d at 270. During his hiring interviews, the police applicant admitted that he had been arrested for various offenses in a nearby county. That county sheriff's department disclosed that the police applicant's underlying offense had not been a serious one. No further inquiry into the applicant's criminal record history, by way of a NCIC record check or otherwise, was under-

taken before the applicant was hired. The NCIC report, had it been requested, would have revealed that the applicant had been arrested fifteen times for offenses ranging from assault to armed robbery. However, the police officer's record was unblemished from the time of hire up until the shooting of the plaintiff five years later. *Id.* at 270–71.

The Fifth Circuit held that the town's failure to conduct a more thorough investigation into the applicant's background did not cause the deprivation of the plaintiff's constitutional

If the defendants had randomly chosen Mueller and without any background investigation allowed him to become a police officer, this case would, of course, go to a jury. But that is not the case here. The villages took a number of reasonable steps to investigate an applicant's background. We believe that no reasonable jury could conclude that failure to take additional screening steps can said to be "so obvious" as to constitute "deliberate indifference" to constitutional rights. If the defendants had actual knowledge of the severity of Mueller's psychological problems, his history of noncompliance with his medication, and the violence that could result from these problems, and yet closed their eyes to all these facts and hired and retained Mueller, then we would allow this case to go to a jury. However, from the perspective of the villages, the police commission, and Rentmeester, they were furnished with satisfactory information about Mueller's health and background at the time he was hired up until the time he shot Graham in 1986. Likewise, if the defendants' hiring and supervision policies had resulted in a pattern of hiring dangerous police officers and yet the defendants continued to employ these policies, this would be a jury case. However, there is no evidence of any such pattern in this case. Accordingly, the district court did not err in granting summary judgment in favor of the villages, the police commission, and Rentmeester.

## Loss of Life Damages

The villages and the police commission contend that the district court erred in allowing John Graham's estate to recover loss of life damages. In *Bell*, we held that § 1983 provides Wisconsin plaintiffs with an unqualified right to bring an action to recover loss of life damages even though Wisconsin wrongful death statutes do not permit a victim's estate to recover damages for loss of life. 746 F.2d at 1240. The defendants do not challenge our holding in *Bell* or otherwise contest the right of Graham's estate to bring an action for loss of life damages.[14] Rather, the defendants argue that the award for loss of life damages was not appropriate under the particular circumstances of this case.

■ Section 1983 damages are considered to be appropriate as long as those damages generally effectuate the policies underlying § 1983. *See Carey v. Piphus*, 435 U.S. 247, 258–59, 98 S.Ct. 1042, 1049–50, 55 L.Ed.2d 252 (1978); *Bell*, 746 F.2d at 1238–39. The fundamental policies underlying § 1983 are compensation for, and deterrence of, unconstitutional acts committed under state law. *Robertson v. Wegmann*, 436 U.S. 584, 590–91, 98 S.Ct. 1991, 1995, 56 L.Ed.2d 554 (1978); *Monroe v. Pape*, 365 U.S. 167, 172–87, 81 S.Ct. 473, 476–84, 5 L.Ed.2d 492 (1961). In *Bell*, we stated that where the unconstitutional act is the taking of a life, there would result more than a marginal loss of influence on potentially unconstitutional actors and, therefore, on the ability of § 1983 to deter official lawlessness, if the victim's estate could not recover loss of life damages. 746 F.2d at 1239; *see also Bass v. Wallenstein*, 769 F.2d 1173, 1190 (7th Cir.1985). The defendants contend that this case is distinguishable from *Bell* and other § 1983 precedents in which this court has allowed loss of life damages. Specifically, the defendants contend that, in contrast with our precedents, no significant deterrence would result if we allow Graham's estate to recover loss of life damages. The defendants advance three arguments along these lines.

■ First, the defendants argue that the deterrent rationale is not as compelling in this case as it was in *Bell* because Mueller's shooting, unlike that in *Bell*, was not motivated by racial animus—both Mueller and Graham are caucasians. While the loss of life damages in *Bell* may have been

rights. *Id.* at 275. Specifically, the court reasoned that the town's failure to order an NCIC check on the applicant's full arrest history did not constitute gross negligence or conscious indifference to the public welfare. *Id.*

14. In *Bell*, we reasoned that Wisconsin wrongful death statutes did not apply because they were inconsistent with the federal policy (embodied in the fourteenth amendment and § 1983) of deterring unconstitutional acts that deprive persons of life. 746 F.2d at 1239.

directed partially towards deterring deprivations of life that are motivated by racial animus, we emphasized that the legislative history underlying § 1983 expresses an unequivocal concern for *protecting life*. 746 F.2d at 1239. Thus, while § 1983 damages may in some cases be aimed at deterring a specific motivation (for instance, racial animus) for an unconstitutional killing, the overriding concern of § 1983 is deterring unjustified takings of life. The fact that Mueller's shooting of Graham was not motivated by racial animus does not weaken the ability of loss of life damages in this case to deter potential unconstitutional actors from taking a life, regardless of what their motivation may be.

Second, the defendants argue that the deterrence rationale is not compelling in this case because Mueller's death obviates the need to deter any further conduct on his behalf; in addition, they argue that even if Mueller was still alive, his mental condition would render him incapable of understanding the reason for which loss of life damages were being imposed. In a similar contention, the defendants argue that conduct such as Mueller's cannot be deterred because Mueller was suffering from a condition which rendered him mentally incapable of exercising reasonable judgment at the time he shot Graham.

The fact that Mueller can no longer be deterred is quite irrelevant. The deterrence objective of § 1983 damages is directed at a broader category of persons than the individual perpetrator alone. In *Bell*, this court stated that loss of life damages are intended to have a deterrent effect on "potentially unconstitutional *actors*." 746 F.2d at 1239 (emphasis added). No specific deterrence could have been accomplished in *Bell* because in that case, the offending officer had resigned from the force. Like Mueller, the officer in *Bell* was no longer in a position to repeat his unconstitutional acts.

In addition, there is no reason to conclude that the loss of life award in this case is directed only at persons with a condition similar to Mueller's—those who may act under an "insane delusion." The loss of life award to Graham's estate is directed towards deterring any police officer who would contemplate taking the life of a person who poses no threat of harm to the officer or the public.

Finally, the defendants argue that, in the final analysis, the deterrence rationale is completely inapplicable in this case because the parties that will ultimately pay the loss of life damages—the villages and the police commission—need not be deterred because they did not violate any of Graham's constitutional rights; rather, they have been found liable only by reason of indemnity pursuant to Wis.Stat. § 895.46.

In *Bell*, we allowed loss of life damages to be awarded against the offending officer even though the city of Milwaukee was ultimately responsible for paying those damages under the indemnity statute. 746 F.2d at 1271-72. We see no reason to treat this case differently. It is important to emphasize that the loss of life damages that have been awarded to Graham's estate are not an attempt to deter municipalities from acting as the villages and the police commission did in this case. As we determined in the previous section, the defendants' hiring, supervision, and retention of Mueller did not violate Graham's constitutional rights. The jury awarded loss of life damages against Mueller because of Mueller's conduct. The conduct sought to be deterred is the shooting of a person who poses no threat of harm, not the conduct of the villages and the police commission.

While the loss of life damages may be *directed* at deterring Mueller's conduct, this does not address the defendants' argument that damages will not deter a person who ultimately does not pay those damages. Even assuming that the defendants' argument is correct in all cases, however, it is still not determinative. It is important to reemphasize that the loss of life damages in this case are not merely directed at deterring actors identically situated to Mueller. Not all Wisconsin employees who deprive citizens of life under color of law will be covered by the Wisconsin indemnity statute—that is, not all will be deemed to be acting within the scope of their employ-

ment. More important, § 1983 is a federal statute, and thus, its interpretation should not vary from state to state depending on state indemnity rules. Not all potential unconstitutional actors live in states with liberal indemnity statutes. The deterrent effect on these actors should not be sacrificed merely because the Wisconsin legislature decided to provide broad indemnity coverage. *See Carlson v. Green,* 446 U.S. 14, 23, 100 S.Ct. 1468, 1474, 64 L.Ed.2d 15 (1980) (uniform federal rule necessary to deter officials from violating federal constitutional rights). A uniform rule also makes sense when the compensatory aspect of loss of life damages is considered. It makes no sense to preclude Wisconsin plaintiffs from recovering loss of life damages while plaintiffs in other states can recover those damages solely because their legislature has enacted less liberal indemnity rules.

■ Finally, the defendants contend that the district court tendered an erroneous jury instruction regarding loss of life damages. Specifically, the defendants argue that the instruction was so broad and vague that it failed to guide the jury on how to evaluate and award damages for loss of life. However, due to the defendants' failure to comply with Federal Rule of Civil Procedure 51, they have waived this argument on appeal. Rule 51 states that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51.

Before instructing the jury, the district judge held an informal instructions conference without a court reporter being present; counsel for the defendants claims that during this conference, he argued that the proposed loss of life instruction was overbroad and vague. We say "claims" because no record exists of the informal

conference and because Graham's counsel told us at oral argument that he does not recall whether or not defense counsel registered vagueness and overbreadth objections during the informal conference. After the informal conference and after instructing the jury, but before the jury began its deliberations, the district judge afforded the parties a full opportunity to record objections to the instructions. While on the record, the court specifically asked whether defendants had any comments, objections or motions in response to the instructions given to the jury. Counsel for the defendant stated: "Nothing other than what we have already put on the record, your honor." Of course, defense counsel had not "already put on the record" any objections as to the overbreadth and vagueness of the loss of life instructions.

■ Traditionally, an objection to a jury instruction was not considered timely under Rule 51 unless a party registered specific objections to the instruction *after* the court gave the instruction but *before* the jury retired to deliberate. *See Fey v. Walston & Co., Inc.,* 493 F.2d 1036, 1047 (7th Cir.1974); *Hetzel v. Jewel Co.,* 457 F.2d 527, 535 (7th Cir.1972).[15] We further construed this rule in *United States v. Hollinger,* 553 F.2d 535 (7th Cir.1977). In *Hollinger,* we held that after the jury was instructed, counsel could incorporate by reference any specific and distinct objections voiced in a pre-charge instructions conference as long as the pre-charge instructions conference was on the record. *Id.* at 542–43. Here, counsel for the defendants failed to register *on the record* objections which he could have incorporated into the record after the jury was instructed. The principles of incorporation set forth in *Hollinger* do not extend to a case such as this where no record exists in which the defendants voiced an objection to the vagueness or the overbreadth of the

---

**15.** The rationale for this rule was that it provided trial courts, upon second thought, an opportunity to correct any errors in the instructions. This included inadvertent errors and, more importantly, errors which could not have been

predicted prior to the charge. *See United States v. Wright,* 542 F.2d 975, 983 (7th Cir.1976); *Hetzel v. Jewel Co.,* 457 F.2d 527, 535 (7th Cir.1972); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2551 (1971).

instructions. *See Fisher v. Krajewski*, 873 F.2d 1057, 1065 (7th Cir.1989) (objection to jury instruction waived unless party objects to instruction on the record in district court). The defendants have failed to follow the dictates of Rule 51; thus, they have waived their argument that the jury instructions for loss of life damages were overbroad and vague.[16]

### Attorney Fees

In any action or proceeding to enforce § 1983, 42 U.S.C. § 1988 allows a district court, in its discretion, to award reasonable attorney fees to a prevailing party as part of its costs. Pursuant to § 1988, the district court awarded $132,228.50 in attorney fees in favor of Crystal Graham and against the estate of John Mueller. Because Mueller's estate is insolvent, Graham brought an action against the Sauk Prairie Police Commission and the Villages of Sauk City and Prairie Du Sac seeking to require them to pay the attorney fees awarded against Mueller's estate. Graham's action to require the villages and police commission to pay the attorney fees was not based on § 1988; rather, it was based on Wis.Stat. § 895.46(1)(a), the Wisconsin statute that requires a municipality to indemnify its employees for judgments entered against them. The district court held that the indemnity statute required the municipal defendants to indemnify Mueller's estate for the award of attorney fees. The defendant villages and police commission appeal the district court's decision.

The defendants contend that the Wisconsin indemnity statute, when read in conjunction with Wis.Stat. § 814.04(1)(a), limits their liability for attorney fees to $100. To reiterate, the indemnity statute provides in relevant part:

> If the defendant in any action ... is proceeded against in an official capacity

or ... as an individual because of acts committed while carrying out duties as an officer or employe and the jury or the court finds that the defendant was acting within the scope of employment, *the judgment as to damages and costs ...* shall be paid by the state or political subdivision of which the defendant is an officer or employe....

Wis.Stat. § 895.46(1)(a) (emphasis added). Defendants claim that the "costs" referred to in the indemnity statute are enumerated in Wis.Stat. § 814.04(1)(a), which states that, "[e]xcept as provided in [certain statutes not applicable here], when allowed costs shall be as follows: (1) *Attorney's fees.* (a) When the amount recovered or the value of the property involved is $1,000 or over, attorney fees shall be $100...." The defendants argue that the district court erred in reading § 1988's definition of costs into the state indemnity statute. The defendants argue that because state law (Wis.Stat. § 895.46) creates their liability for attorney fees, the district court was bound by state law limits to attorney fees —namely, the $100 limit set forth in Wis. Stat. § 814.04(1)(a).

It is true that the right to recover costs, including attorney fees, is statutory in nature and to the extent that a statute does not authorize recovery of specific costs, they are not recoverable. *State v. Foster*, 100 Wis.2d 103, 105–06, 301 N.W.2d 192, 194 (1981); *City of Milwaukee v. Leschke*, 57 Wis.2d 159, 161, 203 N.W.2d 669, 670 (1973). However, the term "costs" as used in the indemnity statute is limited by Wis.Stat. § 814.04(1)(a) only when § 814.04 is the statute which authorizes a court to award attorney fees. Section 814.04(1)(a) confers authority upon a state court to award limited attorney fees to a successful party as an item of costs in certain actions. In contrast, the indemnity

---

**16.** On several occasions during the district court proceedings, the defendants argued (on the record) that this was not an appropriate case for a loss of life award and that the jury should not receive an instruction for loss of life damages. However, this court has recognized that an objection to the giving of a damages instruction does not state (or preserve) an objection to the

content of those instructions once they are given. *Coulter v. Vitale*, 882 F.2d 1286, 1289 (7th Cir.1989); *Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1295 (7th Cir.1987). Accordingly, the defendants' objection to the court tendering loss of life instructions does not preserve any objection they have to the vagueness or overbreadth of those instructions.

statute does not confer or limit authority to award costs in favor of one party or the other; rather, it merely requires municipalities to pay costs that already have been levied against their employees—regardless of what statute those costs were levied under. The district court's authority to award Graham "costs" for her § 1983 suit was provided by 42 U.S.C. § 1988, not Wis. Stat. § 814.04(1)(a). Accordingly, the district court correctly held that the defendants' liability for attorney fees is not limited to $100 by reason of Wis.Stat. § 814.04(1)(a); rather, the defendants are required to pay all "reasonable attorney fees" that were levied against Mueller's estate under § 1988.

The defendants contend that even if they are liable for more than $100 of attorney fees, they are not liable for fees Graham incurred in establishing the defendants' liability under the Wisconsin indemnity statute. In support of their contention, the defendants rely on *Hibma v. Odegaard.* In *Hibma,* we held that a district court properly disallowed attorney fees that were attributable to a § 1983 plaintiff's action against a municipal defendant under the Wisconsin indemnity statute. 769 F.2d at 1158. We reasoned that the district court properly disallowed fees because the indemnity statute neither enhanced nor diminished the award obtained under § 1983; rather, it merely provided a means for the plaintiff to collect part of his civil rights judgment. *Id.* As the district court noted, however, *Hibma* appears to be inconsistent with our later decision in *Argento v. Village of Melrose Park,* 838 F.2d 1483 (7th Cir.1988). In *Argento,* a civil rights plaintiff won a judgment for damages and attorney fees against two Melrose Park police officers. The plaintiff subsequently won a judgment requiring Melrose Park to indemnify the police officers pursuant to the Illinois indemnity statute. In a separate § 1988 action, the district court awarded plaintiff the attorney fees he incurred in his action to require Melrose Park to indemnify the police officers. *Id.* at 1486. On appeal, we upheld this award under the principle that "[a] prevailing civil rights plaintiff is entitled to attorneys' fees in-

curred in collecting his civil rights judgment." *Id.* at 1495–96. As we acknowledged in *Hibma,* an indemnity action is merely a means for a plaintiff to collect a civil rights judgment from indemnifying municipalities. 769 F.2d at 1158.

To the extent that *Hibma* is inconsistent with *Argento,* we believe that *Argento* should govern this case because it is more consistent with the policies underlying § 1988 and the Wisconsin indemnity statute. As mentioned, Mueller's estate is insolvent. Absent indemnification, Graham would not actually recover the money she was awarded in her § 1983 suit against Mueller. Allowing Graham to recover attorney fees for pursuing her indemnity claim furthers § 1988's purpose of ensuring effective access to the judicial process for persons with civil rights grievances. *See Blanchard v. Bergeron,* 489 U.S. 87, 95–96, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989); *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). In addition, requiring the municipal defendants to indemnify Mueller for these fees also furthers the indemnity statute's policy of protecting a public employee from personal financial loss because of a judgment resulting from an act committed within the scope of employment. *See Beane v. City of Sturgeon Bay,* 112 Wis.2d 609, 613–16, 334 N.W.2d 235, 237–38 (1983).

■ Finally, the defendants contend that the district court erred in awarding Graham the full amount of her fee request. Our review of the size an attorney fees award is very limited. Given the district court's superior understanding of the litigation and the desirability of avoiding appellate review of what are essentially factual matters, the determination of a fee award is left to the sound discretion of the district court. *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941; *Spanish Action Comm. of Chicago v. City of Chicago,* 811 F.2d 1129, 1134 (7th Cir.1987). Accordingly, if reasonable persons could differ over the trial court's view, we will not find an abuse of discretion. *Lightfoot v. Walker,* 826 F.2d 516, 520 (7th Cir.1987); *Munson v. Friske,* 754 F.2d 683, 696 (7th Cir.1985).

The Supreme Court has stated that the most useful starting point for determining the amount of a reasonable attorney's fee under § 1988 is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This figure, commonly referred to as the "lodestar," is presumed to be reasonable under § 1988. *City of Riverside v. Rivera*, 477 U.S. 561, 568, 106 S.Ct. 2686, 2691, 91 L.Ed.2d 466 (1986); *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. The district court found that Graham's attorneys spent 949.3 hours on specific successful claims, 390.5 hours on matters that cannot be separated out to specific claims, 84.55 hours in preparation of the motion for attorney fees, and an additional 14.7 hours in responding to defendants' arguments in opposition to Graham's motion for attorney fees. Multiplying these hours times the hourly rate of Graham's attorneys resulted in a total fee award of $132,228.50.

While the district court noted that the total number of hours is high, it also found that they were reasonable in light of the work required and the results achieved. The district court found that the time claimed by Graham's attorneys was reasonable and necessary and that the hourly rates were well justified by the attorneys' qualifications and experience. We do not think the district court abused its discretion. As the district court aptly noted, the defendants have conceded nothing at any point in this litigation; their defense was resolute, if not intransigent at times. A defendant cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response. *City of Riverside*, 477 U.S. at 580, 106 S.Ct. at 2697 n. 11.

After determining the lodestar to be $132,228.50, the district judge had to determine whether any adjustment to the fee was required. In addition to excluding hours that are not "reasonably expended" on the litigation, where a prevailing plaintiff has succeeded on only some of his claims, it may not be appropriate to award fees for time reasonably expended on the unsuccessful claims. *City of Riverside,*

477 U.S. at 568, 106 S.Ct. at 2691. In cases where unsuccessful claims are "related" to the successful claims—that is, where the successful and unsuccessful claims involve a common core of facts or are based on related legal theories—it is difficult to divide the hours expended on a claim by claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead, a court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation. Where a plaintiff obtains excellent results, his attorney should recover a fully compensatory fee. The fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940; *City of Riverside*, 477 U.S. at 568, 106 S.Ct. at 2691.

On the other hand, where a plaintiff fails to prevail on a claim that is "unrelated" to the plaintiff's successful claims—that is, a claim that is distinct in all respects from the successful claims—the hours expended on the unsuccessful claim should be excluded in determining the amount of a "reasonable fee." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940.

The district court found that to the extent unsuccessful claims are included among those for which Graham seeks attorney fees, they share a common core of facts with the successful claims and are based on related legal theories; thus, they are not sufficiently discrete to make it possible to divide up the time spent on a claim by claim basis. The district court concluded that Graham achieved a significant victory on her central claims and that she obtained all that she could have reasonably asked for. We do not believe the district court has abused its discretion. Thus, we agree with the district court that Graham's fee award should not be reduced simply because Graham failed to prevail on every contention raised in the lawsuit.

The district court found that Graham's unsuccessful claims for municipal liability were "unrelated" to Graham's successful claims. However, the district court noted

that Graham's counsel carefully separated the time spent on these unsuccessful claims from that spent on successful claims and did not even seek reimbursement for them. We agree with the district court's conclusion that Graham's unsuccessful unrelated claims are not grounds for a fee reduction.

The defendants raise a number of other issues and arguments, but they have no merit and require no discussion. Accordingly, the decision of the district court is, in all respects, AFFIRMED.