**Hill STOKES, Plaintiff–Appellant,**

v.

**Willie BULLINS, et al., Defendants–Appellees.**

No. 87–4094.

United States Court of Appeals, Fifth Circuit.

May 10, 1988.

Michael T. Lewis, Pauline Shuler Lewis, Luckett Law Firm, Clarksdale, Miss., for plaintiff-appellant.

Tyree Irving, Greenville, Miss., for defendants-appellees.

Before CLARK, Chief Judge, JOLLY, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The issue before us in this bench-tried police brutality case is whether a municipality was grossly negligent in hiring the defendant police officer and, if so, whether its gross negligence subjects it to liability under 42 U.S.C. § 1983. We affirm the district court judgment exonerating Jonestown from liability.

## BACKGROUND

On December 10, 1982, Willie Bullins and W.B. Williams, two Jonestown, Mississippi police officers, stopped Hill Stokes to execute an arrest warrant issued for contempt of court for failure to pay a $30 traffic fine. The officers gave Stokes the choice of paying the fine or being arrested. Stokes initially denied having the money, but after talking with the officers he offered to pay the fine. Bullins then made some comment to the effect that Stokes was a smart-aleck and shot him twice. Bullins placed a "throw-down gun" by Stokes' body to make the shooting appear to be in self-defense. Stokes suffered permanent partial disability and was declared 100% disabled by the Social Security Administration. He filed an action pursuant to 42 U.S.C. § 1983 against Bullins, Williams, the town of Jonestown, and Jonestown's mayor and board of aldermen alleging that the defendants had violated his constitutional right to be free from the use of excessive force as guaranteed by the fourth and fourteenth amendments. Stokes sought compensatory damages of $850,000 and punitive damages of $1,000,-000.

In its findings of fact, the district court noted that Jonestown had hired Bullins as a police officer in November 1977. During the hiring interviews with Jonestown's mayor and aldermen, Bullins admitted that he had been arrested in nearby Bolivar County for various offenses. Jonestown officials contacted the Bolivar County Sheriff's Department to confirm the arrests. Finding that the underlying offenses were

not of a serious nature,[1] Jonestown officials made no further inquiry and hired Bullins. James Shanks, mayor of Jonestown when Bullins was hired, testified that town officials usually did not conduct a background investigation of a police candidate beyond the inquiries made regarding Bullins. The town had never employed more than three policemen at one time, however, and Bullins was one of the few non-natives hired by Jonestown.[2] Bullins' record as a town police officer bore no marks of excessive force between the date of his hiring and the Stokes incident five years later.

Keith Ouvre, the Hattiesburg chief of police and plaintiff's expert witness on police department hiring practices, testified that minimum adequate screening of police candidates requires an employer to utilize the National Crime Information Center (NCIC) computer network, which furnishes a complete arrest and conviction record on any person. Ouvre explained that a Mississippi municipality may request an NCIC report through the local sheriff's department. Had Jonestown officials requested an NCIC report, they would have found records on Bullins dating back to 1966 involving approximately fifteen arrests for offenses ranging from simple assault to armed robbery. He had been arrested not only in Bolivar County, but in Coahoma County, Mississippi and in Chicago, Illinois.

Regarding the Stokes shooting, the district court found "evidence show[ing] that Stokes and Bullins knew each other but that they did not associate socially. The evidence also indicated the possibility that some personal animosity existed between them."

The district court concluded as a matter of law that:

1. Bullins was acting under color of state law when he shot Stokes.
2. Bullins' use of force was excessive as defined in *Shillingford v. Holmes*, 634 F.2d 263 (5th Cir.1981), and thus Bullins deprived Stokes of liberty without due process of law.

3. Jonestown's hiring practices were actions taken under color of state law.
4. As a matter of policy, Jonestown's governing body does not conduct a minimally acceptable background investigation of police applicants.
5. Jonestown's governing body was grossly negligent in reviewing Bullins' application and in hiring Bullins as a police officer.
6. Stokes failed to satisfy his burden of showing a causal connection between the town's failure to adequately scrutinize his background and consequent decision to employ him as a police officer and the constitutional deprivation in this case.

The district court awarded damages of $404,553.29 against Bullins and dismissed the action with prejudice against Williams and the town of Jonestown and members of its governing body. Bullins has not appealed the judgment. Stokes, however, objects vigorously to the district court's failure to find that Jonestown's grossly negligent hiring of Bullins "caused" the deprivation of Stokes' constitutional rights. Stokes would incorporate Mississippi tort law notions of causation into the § 1983 analysis of Jonestown's liability. The town responds that "the mere act of hiring Bullins" cannot be constitutionally tortious and that its failure to request an NCIC check before hiring Bullins was not the "proximate cause" of Stokes' injuries. We are thus required to wade into the thicket of § 1983 municipal liability for the constitutional violations of city employees.

## ANALYSIS

### A. *Monell*

*Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), furnishes the starting point for our analysis. In *Monell*, the Supreme Court partially overruled *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), by determining, upon

---

**1.** The record does not disclose the nature of the offenses.

**2.** Bullins had resided in Jonestown for two or three years prior to being hired, however.

a more extensive consideration of the legislative history of § 1983, that local units of government may be "persons" potentially liable for constitutional violations. A city, for instance, falls within § 1983 as originally passed, if it "under color of any law, ... custom or usage ... *shall subject, or cause to be subjected,* any person ... to the deprivation of any rights, privileges, or immunities secured by the constitution...." 17 Stat. 13 (emphasis added). Interpreting this language and pertinent legislative history, *Monell* held that Congress "plainly" did not intend to impose vicarious liability on municipal persons for their employees' torts. 436 U.S. at 691, 95 S.Ct. at 2036. On the contrary, official policy must have "caused" an employee to violate another's constitutional rights. *Id.* at 692, 95 S.Ct. at 2036. Local government units may be liable only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. at 2035–36.[3]

*Monell* admittedly posed no difficult question concerning the liability of New York City, for the case was filed to challenge a municipal policy of discharging pregnant employees irrespective of their medical needs. Therefore, the Court rightly disclaimed any intention to address "what the full contours of municipal liability under § 1983 may be." *Id.* at 695, 98 S.Ct. at 2038. Later decisions have demonstrated that where a city's deliberate policy or act directly violated a person's constitutional rights, § 1983 liability will follow. *See Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (City liable under § 1983 for violating substantive and procedural due process rights by discharging Chief of Police without notice of reasons and without holding a hearing.); *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (City liable under § 1983 for violating constitutional rights to free

expression and due process by revoking concert license). The city's act in each case was directly responsible for the constitutional violation.

### B. *Tuttle and Later Cases*

The Supreme Court has struggled over the question of municipal liability where a non-policymaking official perpetrated the constitutional violation and/or where no explicit city action or policy directly caused the violation. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), epitomizes the problem. *Tuttle* dealt with a fatal shooting by a local policeman. Municipal liability was urged on the basis that Oklahoma City failed to train its police officers adequately, that this failure amounted to gross negligence or deliberate indifference to "police misconduct", and consequently that its "policy" in this regard "caused" the killing. The jury was so instructed by the trial court, with the critical addition that they were allowed to "infer", from the single use of excessive force in Tuttle's case, the city's gross negligence amounting to deliberate indifference. A majority of the Court agreed that imposing municipal liability under § 1983 by inferring the existence of city policy from a single instance of misconduct by a subordinate non-policymaking city employee would eviscerate the statutory distinction between vicarious and direct municipal liability.

The Court was seriously divided, however, over the possible imposition of municipal liability for any "policy" of "inadequate training." Justice Rehnquist's plurality opinion described such a "policy" as not itself unconstitutional, 105 S.Ct. at 2436 n. 7, and observed that "some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* [rejecting vicarious liability] will become a dead letter.... At the very least there must be an affirmative link between

---

**3.** Further, "it is *when execution of a government's policy or custom,* whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, *inflicts*

*the injury* that the government as an entity is responsible under § 1983." 436 U.S. at 694, 98 S.Ct. at 2037–38 (emphasis added).

the policy and the particular constitutional violation alleged." *Id.* at 2436. The plurality opinion ends with the suggested test that "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.* (footnotes omitted).

Justice Brennan's opinion for three members of the court chided as "metaphysical [the] distinction between policies that are themselves unconstitutional and those that cause constitutional violations." 105 S.Ct. at 2441 n. 8. This group would hold that "[i]f a municipality takes actions—whether they be of the type alleged in *Monell, Owen, or this case*—that cause the deprivation of a citizen's constitutional rights, section 1983 is available as a remedy." *Id.* (emphasis added). The plaintiff would then be required to demonstrate that the city's "official decisions" concerning police training and procedures resulted in the killing of Tuttle. 105 S.Ct. at 2439.[4]

The Supreme Court has not yet resolved the status of, or standard of proof required for, claims based on a city's failure to act or inadequate acts as "policy" under § 1983. Over a dissent, the Court declined to decide these issues arguably raised in

City of Springfield, Mass. v. Kibbe, —— U.S. ——, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987). While studiously declining to rule, the Court has nevertheless defined "policy," upon which such liability may be based as "generally imply[ing] a course of action *consciously chosen* from among various alternatives[.]" *Tuttle*, 105 S.Ct. at 2436 (emphasis added; footnote omitted).[5] To require a conscious choice is at odds with simple negligence, although it may not be inconsistent with liability for reckless conduct. *See Restatement (Second) of Torts* § 500 (1965). In a similar although not precisely apposite vein, the Court recently observed that "the mere failure to investigate the basis of a subordinate's discretionary decisions [in the absence of a particular decision by the subordinate that is cast in policy form and expressly approved by a supervising policymaker, or a series of decisions by a subordinate of which the supervisor must have been aware] does not amount to a delegation of policymaking authority...." *City of St. Louis v. Praprotnik,* —— U.S. ——, ——, 108 S.Ct. 915, 927, 99 L.Ed.2d 107 (1988). Moreover, a simple failure to act will not forge municipal liability. *See Rizzo v. Goode,* 423 U.S. 362, 375–76, 96 S.Ct. 598, 606, 46 L.Ed.2d 561 (1976). One may read the tea leaves and conclude that mere negligence will not ultimately be a sufficient basis for § 1983 municipal liability.[6]

---

**4.** Justice Stevens, dissenting, rejected *Monell's* distinction between direct and vicarious municipal liability and would apply *respondeat superior* to local government units under § 1983. 105 S.Ct. at 2443. Justice Powell did not participate in the decision.

**5.** This definition of "policy" was cited approvingly by the majority in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986).

**6.** In rejecting respondeat superior liability of local government units, *Monell* held that "the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036.

In addition to relying on the text of § 1983, *Monell* draws much support from the legislative

history of the 1871 Civil Rights Act, particularly in Congress's rejection of the Sherman Amendment, which would have held local governments liable in damages for their inability to control Ku Klux Klan violence. As *Monell* explains it, "the amendment as drafted did impose a species of vicarious liability on municipalities since it could be construed to impose liability even if a municipality did not know of an impending or ensuing riot or did not have the wherewithal to do anything about it. Indeed, the amendment held a municipality liable even if it had done everything in its power to curb the riot." *Id.* at 692 n. 57, 98 S.Ct. at 2036–37 n. 57. The final version of this portion of the statute imposed limited liability for wrongs "mentioned in section 1985" upon any person who, having *knowledge* that wrongs are about to be committed and having *power* to prevent or aid in preventing the wrongs, *neglects or refuses to do so.* 42 U.S.C. § 1986.

*Monell* concludes that "when Congress' rejection of the only form of vicarious liability

## C. *Fifth Circuit Case Law*

Our analytical struggle in post-*Monell* cases has been to explain the circumstances under which, or even whether, a city may be said to have "subjected, or caused to be subjected" any person to a constitutional deprivation other than by a direct, official action or affirmative policy that operates against the plaintiff himself. Our court has shied away from the conclusion that a municipality's gross negligence in training its police force could constitute "policy" under *Monell*,[7] regarding such holdings by other courts as a "most expansive view of *Monell*." *Berry v. McLemore*, 670 F.2d 30, 32–33 and n. 1 (5th Cir.1982). In *Languirand v. Hayden*, 717 F.2d 220 (5th Cir. 1983), while expressly declining to rule whether there is a cause of action for failure to train a police force under § 1983, we observed that *if* any such action exists, it must be predicated upon gross negligence amounting to conscious indifference by the city and may not be imputed solely from the negligence or gross negligence of subordinate officials. There must be a pattern or practice of constitutional violations supporting such a theory. *Id.* at 227–28.[8]

In *Rankin v. City of Wichita Falls, Texas*, 762 F.2d 444 (5th Cir.1985), we rejected the contention that gross negligence in the operation of a city's waste treatment plant could support a § 1983 claim and emphasized that for such a constitutional action, "the plaintiffs must at least make allegations sufficient to permit them to prove the *abuse of special authority or obligation of government*." 762 F.2d at 448. We further observed that because modern negligence principles are designed to effect a shifting of the costs of injury, "these principles diverge from those underlying a section 1983 action, which focuses on the abuse of state coercive power. Accordingly, it would be unwise to link section 1983 liability too closely to negligence theories." *Id.* at n. 4.

## D. *Application*

█ This case differs from *Monell*, *Tuttle*, *Languirand* and *Rankin* factually. It is not, like *Monell*, a case in which the city's affirmative policy was unconstitutional. *Tuttle* and *Languirand* involved police training, not police hiring. On the other hand, as in *Tuttle* and *Languirand*, there is not a complete absence of evidence of official action that was arguably related to the shooting of Stokes. Finally, although *Rankin* involved the city's operation of a sewage plant, an activity without constitutional overtones, this case squarely implicates a citizen's right to be free from police brutality. From the principles evident in these authorities, however, we conclude that to hold the town of Jonestown liable here would march municipal liability

---

presented to it is combined with the absence of any language in § 1983 which can easily be construed to create *respondeat superior* liability, the inference that Congress did not intend to impose such liability is quite strong." 436 U.S. at 692 n. 57, 98 S.Ct. at 2037 n. 57. By the same token, this legislative history concerning the Sherman Amendment may be said also to support that construction of § 1983 which requires "knowledge" of a constitutional wrong prerequisite to its "causation." The language of § 1983 ["subject, or cause to be subjected ..."] and § 1986 [having "knowledge" of a wrong but "neglecting" or "refusing" to prevent it], read in conjunction with the legislative history, is conducive to a scheme of liability framed around intentional tortious conduct.

7. We defined "policy" in *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984) (en banc). *Webster* was not, however, a negligence or gross negligence case and is therefore not precisely apposite to this discussion.

8. In *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir.1985), municipal liability was imposed where police surrounded and gunned down an innocent man. The opinion rejected grossly negligent training as a basis for § 1983 liability, but it found a city policy of prevalent recklessness. 767 F.2d at 170–71. As to application of *Grandstaff* in subsequent cases, *see Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir.1986). ("*Grandstaff* affirmed a judgment against a Texas city on a highly peculiar set of facts[.] ... The *Grandstaff* panel emphasized the extraordinary facts of the case, and its analysis can be applied only to equally extreme factual situations.").

Some support for the *Languirand* test was evinced by the four dissenting justices in *Kibbe, supra*, who would have decided that case on its merits and would require a finding that a city's training policy "was conducted with reckless disregard for the consequences or deliberate indifference to its citizens' rights." 107 S.Ct. at 1121.

too far down a path toward liability based on simple negligence. In so doing, we would fatally undermine *Monell's* rejection of respondeat superior liability. This case, upon reflection, satisfies neither the factual nor legal predicate for municipal liability on a theory of gross negligence or recklessness.

The town of Jonestown acted, in a sense, by hiring Bullins after it knew he had been arrested in nearby Bolivar County. According to the district court, however, the town critically failed to act by not ordering an NCIC check on Bullins' full arrest history and by not otherwise more completely investigating his background. These failures were deemed gross negligence and conscious indifference to the public welfare. With deference to the district court's conscientious efforts, we disagree.

The record reflects that officer Bullins had lived in Jonestown for two to three years before being hired as a police officer. The mayor and aldermen had lived with him in the close quarters of a tiny hamlet and had not observed behavior that made them suspicious of his ability to perform. They questioned him about his background in two or three interviews and from these learned of the Bolivar County arrests. They investigated these incidents, whatever they were, and still found nothing suspicious. Bullins *agreed* to the propriety of a background check. He volunteered that he had been in Chicago, where a number of the arrests were made, although the officials were led to believe he only visited briefly. Surely the most effective form of deception consists in allaying fears by an appearance of utter candor, reinforced by half-truths, and a willingness to acknowledge his past faults. The mayor and aldermen of Jonestown, from their perspective, were furnished complete, satisfactory information on Bullins' background at the time he was hired.

An expert witness, Police Chief Ouvre, nevertheless testified that the town was grossly negligent in hiring Bullins. In part, his conclusion suffers from *post hoc* reasoning, because he distinguished—as not negligent—the hiring of a policeman who had had three prior misdemeanor arrests, from the hiring of Bullins, with some fifteen prior arrests—as grossly negligent. The town only knew of a few minor arrests when it hired Bullins, however. The information on which the town based its decision is therefore consistent with Chief Ouvre's non-negligence hypothesis. Chief Ouvre also erroneously equated Jonestown's failure to perform an NCIC check with gross negligence. The NCIC report is undoubtedly an efficient device, but using that check as a talisman for gross negligence and reckless indifference to the welfare of the citizens is manifestly unfair in this case. Jonestown never employed more than three policemen at a time, most of whom were locals. The apparently innocuous circumstances of Bullins' hiring have been discussed previously. There is no evidence that Jonestown's officials had ever heard of the NCIC procedure because they had never encountered a need to use it. There is also no evidence that their conduct was consciously, recklessly, or unconsciously motivated to employ criminals or brutes on the police force.

There are two fundamental flaws in the district court's reliance upon the expert's testimony. First, in so relying, the court has essentially constitutionalized a single criterion—the NCIC report—for hiring policemen. Liability for constitutional violations is rarely so perfunctorily assessed. Second, an expert's opinion should not be alone sufficient to establish constitutional "fault" by a municipality in a case of alleged omissions, where no facts support the inference that the town's motives were contrary to constitutional standards.[9] We thus find the district court's conclusion, that Jonestown violated § 1983 by hiring Bullins, unsupported by the record and legally inadequate.

9. We do not imply that a municipality may close its eyes to the background of those seeking employment with it. *If* a § 1983 claim may arise from egregious hiring practices, however, we would analogize with *Languirand,* 717 F.2d at 227–28, and require a plaintiff to establish actual knowledge of the seriously deficient character of an applicant or a persistent, widespread pattern of the hiring of policemen, for instance, with a background of unjustified violence. Neither factor is present here, however.

We approve, however, the court's conclusion that Stokes did not prove that the city's "constitutional violation" was a "moving force," *Monell*, 436 U.S. at 694, 98 S.Ct. at 2038, or an "affirmative link," *Tuttle*, 105 S.Ct. at 2436, to the shooting. The district court relied on Bullins' five years of unblemished service as a policeman and on the apparent personal animosity or jealousy between Stokes and Bullins in ruling that Stokes did not satisfy his burden of proving causation.[10] We differ with the court's and the parties' characterization of the issue of causation as governed by state law. This cannot be, because "cause" is part of the definitional language of § 1983 and has been construed by the Supreme Court without reference to specific state law.[11] Regardless, we agree that the trial court's conclusion is supported by *Monell* and *Tuttle*.

The judgment of the district court is AFFIRMED.

---

10. We express no opinion on the propriety of the district court's legal finding that "personal animosity" was the "cause" of the shooting. We need not do so because even if personal animosity was not the cause, we need not therefore conclude by default that the municipality's hiring practices were the cause. The legal issue herein is not resolved by rephrasing it in such mathematical formulae as "If not x, then y" or "If x, then not y."

11. We disagree with the district court's suggestion that "[l]ower court decisions attempting to explicate on these [causation] standards have essentially relied on the law of proximate causation found in state tort law. *See, e.g., Bowen v. Watkins*, 669 F.2d 979, 985 (5th Cir.1982); *Reimer v. Smith*, 663 F.2d 1316, 1322 (5th Cir. 1981); *Rheuark v. Shaw*, 628 F.2d 297, 305–06 (5th Cir.1980)." We have reviewed the three cited cases and find no reference to state law when "causation" under § 1983 is discussed.