**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 93-5376
_____

JILL BROWN,

Plaintiff-Appellee,
Cross-Appellant

VERSUS

BOARD OF THE COUNTY COMMISSIONERS
OF BRYAN COUNTY, OKLAHOMA, ET AL.,

Defendants-Appellants,
Cross-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Texas
_____

(Opinion June 2, 5th Cir., 1995, _____ F.3d _____)

(October 23, 1995)

Before REYNALDO G. GARZA, WIENER, and EMILIO M. GARZA, Circuit
Judges.

REYNALDO G. GARZA, Circuit Judge:

<u>SUBSTITUTE PANEL OPINION</u>[1]

A claim for damages was brought against Reserve Deputy Stacy

Burns (Burns) and Bryan County, Oklahoma (Bryan County),[2] by Jill

_____

[1]The original panel opinion, to which Judge Emilio M. Garza
dissented, <u>Brown v. Bryan County, Ok.</u>, 53 F.3d 1410 (5th Cir.
1995), is withdrawn and is replaced in toto by this opinion, in
which Judge Wiener continues to concur.

[2]This suit was originally brought against several parties, but
the district court dismissed the claims concerning the other
Defendants, leaving Bryan County and Stacy Burns as the only

Brown (Mrs. Brown) pursuant to 42 U.S.C. § 1983 and Oklahoma law. The case proceeded to trial, in which the jury found in favor of the Plaintiff on every interrogatory submitted. The district court entered a judgment in accordance with the jury's verdict with one exception: Mrs. Brown was not allowed to recover for loss of past income or future earning capacity. Burns and Bryan County (collectively the "Appellants") appeal the judgment against them while Mrs. Brown appeals the portion of the judgment that denied her recovery for lost past income and future earning capacity. For the reasons stated below we affirm the district court's judgment.

BACKGROUND

In the early hours of May 12, 1991, Todd Brown (Mr. Brown) and Mrs. Brown were traveling from Grayson County, Texas, to their home in Bryan County, Oklahoma. After crossing into Oklahoma, Mr. Brown, who was driving, noticed a police checkpoint. He decided to avoid the checkpoint and headed back to Texas, allegedly to spend the night at his mother's house. Although the parties offer conflicting stories leading to the pursuit, Deputy Sheriff Robert Morrison (Deputy Morrison) and Burns stated that they "chased" the Browns' vehicle at a high rate of speed before successfully pulling it over. Mr. Brown testified that he was oblivious to the deputies' attempts to overtake him until both vehicles had traveled approximately three miles.[3] By the time the two vehicles

---

Defendants.

[3]Apparently, the road traveled on was winding, thereby, diminishing the visibility of other vehicles approaching from behind.

2

eventually stopped, the parties had crossed into Grayson County, Texas, four miles from the Oklahoma checkpoint.

Immediately after exiting the squad car, Deputy Morrison unholstered his weapon, pointed it toward the Browns' vehicle and ordered the occupants to raise their hands. Burns, who was unarmed,[4] rounded the corner of the truck to the passenger's side. After twice ordering Mrs. Brown from the vehicle, Burns pulled her from the seat of the cab and threw her to the ground. Burns employed an "arm bar" technique whereby he grabbed Mrs. Brown's arm at the wrist and elbow, extracted her from the vehicle and spun her to the ground. Mrs. Brown's impact with the ground caused severe injury to her knees, requiring corrective surgery.[5] While Mrs. Brown was pinned to the ground, Burns handcuffed her and left to assist Deputy Morrison in subduing her husband. Mrs. Brown remained handcuffed anywhere from a minimum of thirty minutes to just over an hour.

According to Mrs. Brown's version of the facts, which will be reviewed in greater detail below, the deputies' pursuit and the force consequently applied against her were unprovoked. Furthermore, she claims that her detention constituted false imprisonment and false arrest. Due to the injuries resulting from that encounter, Mrs. Brown seeks compensation from Burns and Bryan

---

[4]Although Burns was working for the Sheriff's Department, he was not authorized to carry a firearm or drive a squad car.

[5]Mrs. Brown received a total of four operations on her knees. Moreover, medical testimony was elicited at trial which showed that Mrs. Brown would ultimately require total knee replacements.

County. Mrs. Brown premised the county's liability, inter alia, on the hiring of Burns by Sheriff B.J. Moore (Sheriff Moore), the county policymaker for the Sheriff's Department.

DISCUSSION

The Appellants have presented this Court with a host of issues to support their position that the lower court erred. For efficiency's sake, we will address only those points that we believe merit review. We first address the claims against Burns for the constitutional injuries that Brown suffered.

I.

In their first argument, Burns and Bryan County allege that the force applied against Mrs. Brown was proper. Appellants claim that the evidence "undisputedly" established that Burns' actions on the morning of May 12, 1991, were objectively reasonable. Therefore, the jury's findings should be reversed.

All claims that a law enforcement officer has used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other "seizure" of a free citizen, are analyzed under the Fourth Amendment and its "reasonableness" standard. Graham v. Connor, 490 U.S. 386, 395 (1989). The test of reasonableness under the Fourth Amendment requires

> careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Id. at 396. The "reasonableness" of the particular force used must be judged from the perspective of a reasonable officer at the

4

scene, rather than with the 20/20 vision of hindsight. Id. In cases implicating excessive force, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. Id. (citation omitted). Thus, the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. Id. at 397.

Determining whether Burns' actions were reasonable depends on whose story the trier of fact accepts as true. According to the testimony of Burns and Deputy Morrison, they were involved in a "high-speed" pursuit[6] after the Browns abruptly turned their truck and sped from the checkpoint. After a four mile "chase" both vehicles came to a full stop. The deputies exited their vehicle and made several commands for the occupants to raise their hands before those commands were obeyed. After rounding the truck, Burns twice ordered Mrs. Brown to exit the vehicle, but she did not comply. He then perceived that she was "lean[ing] forward" in the cab of the truck as if she were "grabbing a gun."[7] He was "scared to death," so he extracted her from the vehicle. He spun her around, dropped her to the ground via the arm bar maneuver and handcuffed her. That was the lowest amount of force he deemed

---

[6]The deputies testified that they were pursuing the Browns at speeds in excess of 100 miles per hour.

[7]The fact that two firearms were found in the truck *after* the arrest does not make Burns actions any more or less reasonable, unless his actions had resulted from the observation of those guns prior to the arrest. That was not the case, however.

necessary to extract her and ensure he and his partner's safety.

Certainly, Appellants' version of the facts supports a claim that Burns acted reasonably and with an appropriate amount of force. The Browns, however, paint a strikingly different picture. They testified that they were oblivious to the attempts made by the deputies to catch up to them (the Browns) after avoiding the Oklahoma checkpoint.[8] Mr. Brown avoided that stop because he feared the possibility of being harassed or unnecessarily detained by the deputies.[9] He further testified that he did not believe that he turned the truck around either in a reckless fashion nor with wheels squealing or throwing gravel, and that he drove away at a normal rate of speed. Finally realizing that they were being pursued, Mr. Brown pulled over only to find a gun pointed at him. They were ordered to put their hands up and they did so.

Mrs. Brown then testified that Burns ran to her side of the vehicle and ordered her to get out. She was paralyzed with fear and heard Burns repeat the command. According to her testimony, however, she was not slow in responding to Burns' orders and she did not make any sudden moves while exiting the vehicle. Her only forward movement was to exit the truck and, contrary to Burns' testimony, she did not reach for anything. Then, while she was

---

[8]Mr. Brown testified that initially, he did not hear any police sirens, or observe a squad car following them. Finally, after driving for several minutes at speeds of 40 to 55 miles per hour, he glimpsed the blue lights from the deputies' vehicle and determined that he was being pursued. He stopped the truck at the first available opportunity.

[9]Mr Brown alleged that he had been unnecessarily detained at that checkpoint on several occasions.

exiting the truck, Burns suddenly grabbed her arm, yanked her out, spun her around and threw her to the pavement. She could not break her fall because one arm was raised and Burns firmly gripped the other.

In addition to this conflicting testimony, both sides elicited expert testimony concerning the reasonableness of Burns' actions. Mrs. Brown's expert, for example, concluded that the force applied by Burns in this situation was unjustified and excessive.[10] The jury weighed all the evidence, evaluated the conflicting testimony and rendered a verdict in Mrs. Brown's favor. Under our standard of review,[11] when the evidence supports the verdict, this Court will not impose its own opinion in contravention to the jury's.

---

[10]The expert did acknowledge that the force used was the lowest force that could have been applied in extracting and subduing an arrestee without endangering either party. However, he did not feel that the situation required this type of force.

[11]The standard for appellate review of a jury's verdict is exacting. Granberry v. O'Barr, 866 F.2d 112, 113 (5th Cir. 1988). It is the same standard as applied in awarding a directed verdict or a judgment notwithstanding the verdict and is referred to as the "sufficiency of the evidence" standard. Id. The standard is as follows:
> "The verdict must be upheld unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary. If there is evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the jury function may not be invaded."

Id. (quoting Western Co. of North Am. v. United States, 699 F.2d 264, 276 (5th Cir.), cert. denied, 464 U.S. 892 (1983)). Stated another way, the Court should consider all of the evidence, not just that evidence which supports the nonmovant's case, in the light and with all reasonable inferences most favorable to the nonmovant. Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969) (en banc).

Therefore, we will not interfere with the fact finder's conclusion that Burns' actions were unreasonable and that the force he used was excessive.

## II.

Notwithstanding the jury's findings, Appellants also assert that there was probable cause to arrest Mrs. Brown. They argue that the facts justified Burn's actions, thereby precluding Mrs. Brown's § 1983 claim for false arrest.

There is no cause of action for false arrest under § 1983 unless the arresting officer lacked probable cause. Fields v. City of South Houston, Tex., 922 F.2d 1183, 1189 (5th Cir. 1991). To determine the presence or absence of probable cause, one must consider the totality of the circumstances surrounding the arrest. United States v. Maslanka, 501 F.2d 208, 212 (5th Cir. 1974),[12] cert. denied, 421 U.S. 912 (1975). Whether officers have probable cause depends on whether, at the time of the arrest, the "`facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the arrested] had committed or was committing an offense.'" Id. (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). Furthermore, although flight alone will not provide probable cause that a crime is being committed, in appropriate

---

[12]In Maslanka, a police officer observed a car coming down a road and, upon seeing his unmarked car, it turned around and sped away in flight. This Court found that this observation provided sufficient facts for an officer to investigate. Maslanka, 501 F.2d at 213. Upon stopping the car, the officer smelled marihuana smoke, creating the probable cause necessary to arrest the passengers. Id.

8

circumstances it may supply the "`key ingredient justifying the decision of a law enforcement officer to take action.'"  United States v. Bowles, 625 F.2d 526, 535 (5th Cir. 1980) (quoting United States v. Vasquez, 534 F.2d 1142, 1145 (5th Cir.), cert. denied, 429 U.S. 979 (1976)).

To reiterate, whether Burns had probable cause to arrest Mrs. Brown depends in large part on whether the facts, as Burns knew them, were sufficient to warrant a prudent man's belief that Mrs. Brown committed or was in the process of committing a crime.  The facts material to that determination were hotly contested, especially the contradictory testimony relating to the pursuit and Mrs. Brown's movements while exiting the vehicle.  Thus, it was for the fact finder to determine whether Burns had probable cause to arrest Mrs. Brown.  Harper v. Harris County, Tex., 21 F.3d 597, 602 (5th Cir. 1994).  Assuming *arguendo* that the deputies had a reasonable suspicion to perform an investigatory stop, we nevertheless find the evidence sufficient to support the jury's finding that Burns did not have probable cause to arrest Mrs. Brown, and that his doing so violated her constitutional right to be free from false arrest.

As the jury found that Burns did not have probable cause to detain or arrest Mrs. Brown, it could also find from the evidence that she was falsely imprisoned.  To set out a claim for false imprisonment the plaintiff must prove (1) an intent to confine, (2) acts resulting in confinement, and (3) consciousness of the victim of confinement or resulting harm.  Harper v. Merckle, 638 F.2d 848,

9

860 (5th Cir. Unit B Mar.), cert. denied, 454 U.S. 816 (1981). Under § 1983, the plaintiff must also prove the deprivation of a constitutional right, i.e., an illegality under color of state law. Id. The evidence establishes that Mrs. Brown believed herself to be under arrest: even though she had committed no crime, she remained handcuffed for approximately an hour before being released, during which time she was never informed of the nature of the charges for which she was being detained, and subsequently no charges were ever brought. In light of such evidence, a finding of false imprisonment is proper.[13]

## III.

Appellants also contest the jury's finding that Burns was not entitled to qualified immunity. A proper analysis of a qualified immunity defense requires us to conduct a two (sometimes three) prong inquiry. See Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). First, we determine "whether the plaintiff has asserted a violation of a constitutional right at all." Siegert, 500 U.S. at ___, 111 S.Ct. at 1793. Second, we establish whether the law was clearly established at the time of the official's action. Siegert, 500 U.S. at ___, 111 S.Ct. at 1794; Harlow, 457 U.S. at 815-19, 102 S.Ct. at 2737-38. Third, we evaluate the "objective reasonableness of [the] official's conduct as measured by reference to clearly established law."

---

[13]As this Court finds that liability was proper for the claims of excessive force, false arrest and false imprisonment, it need not address the state law issues involved herein.

<u>Harlow</u>, 457 U.S. at 818, 102 S.Ct. at 2739. It is clear that by 1991, use of excessive force, false arrest and false imprisonment had been held to violate citizens' constitutional rights, thus the qualified immunity defense fails if Burns did not act with probable cause. And as the trier of fact determined that Burns did not have probable cause to arrest Mrs. Burns, he is not entitled to qualified immunity.[14]

### IV.

Burns asserts that the evidence is insufficient to support the jury's award of punitive damages. He argues that application of the arm bar technique did not rise to a level of "flagrant" conduct and further, that it did not evidence malice or give rise to an inference of evil intent.[15] Nevertheless, the Supreme Court has ruled that punitive damages are recoverable in a § 1983 action. <u>Smith v. Wade</u>, 461 U.S. 30, 35 (1983). One of the primary reasons for § 1983 actions and punitive damages is to deter future egregious conduct. <u>Id.</u> at 49. A jury may assess punitive damages in an action under § 1983 if the defendant's conduct is shown to be motivated by evil motive or intent, or involved reckless or callous indifference to the federally protected rights of others. <u>Id.</u> at 56. The question is whether the acts of Burns, which caused the

---

[14]"While it is correct that the reasonableness of the arresting officer's conduct under the circumstances is a question of law for the court to decide, such is not the case where there exist material factual disputes . . . ." <u>Harper v. Harris County, Tex.</u>, 21 F.3d 597, 602 (5th Cir. 1994) (discussing officer's qualified immunity).

[15]Mrs. Brown did not respond to this argument in her briefs.

deprivation of Mrs. Brown's constitutional rights, rose to a level warranting the imposition of punitive damages. In light of the evidence before it, we believe that the jury could properly infer that Burns' acts were unjustified and that he acted with callous or reckless indifference to Mrs. Brown's constitutional rights. Therefore, punitive damages were justified.

V.

On cross-appeal, Mrs. Brown argues that it was error for the district court to grant Appellants' Motion for Judgment Notwithstanding the Jury Verdict (JNOV) as it relates to her claims for loss of past income and future earning capacity.[16] Mrs. Brown asserts that neither Bryan County nor Burns specifically raised an issue concerning the sufficiency of the evidence supporting that portion of the judgment, thus the district court's action was unjustified and the award must be reinstated. She insists that there is absolutely no legal predicate on which the district court could base its actions. Therefore, as evidence was offered to support this award, Mrs. Brown argues that the original jury award should be reinstated.

This Court has determined that it "would be a constitutionally impermissible re-examination of the jury's verdict for the district

---

[16]In the order, the district court stated "[t]he jury awarded plaintiff substantial damages in this case, including $36,000 for loss of income in the past and $180,000 for loss of earning capacity in the future. After a review of the evidence in this case, the Court is convinced that there is no legally sufficient evidentiary basis for the award of these damages. Therefore, judgment should be granted for the defendants on plaintiff's claims for loss of income in the past and loss of earning capacity in the future."

court [or this Court] to enter judgment n.o.v. on a ground not raised in the motion for directed verdict." McCann v. Texas City Refining, Inc., 984 F.2d 667, 672 (5th Cir. 1993). It is undisputed that the Appellants did not address the sufficiency of the evidence supporting the jury's award for loss of past income and future earning capacity in their motions for either directed verdict or JNOV. Thus, the lower court should not have decided whether sufficient evidence exists to support this award. However, as the Appellants point out, Mrs. Brown failed to object to this error at trial, and it is the "unwavering rule in this Circuit that issues raised for the first time on appeal are reviewed only for plain error." Id. In other words, this Court will reverse only if the error complained of results in a "manifest miscarriage of justice." Id. Furthermore, contrary to Mrs. Brown's contention, the issue is not whether *any* evidence exists to support the jury verdict. Instead, the issue is whether the district court's action constituted plain error.

Upon reviewing the record, we do not believe that the lower court's error resulted in a manifest miscarriage of justice. The only evidence offered in support of the award comprised of Mrs. Brown's testimony, which reflected that she had accepted an offer to commence work a few days after the day of the incident. Her compensation would have been measured on a commission basis, which she believed would have paid between $1,500 to $1,800 a month. The district court's ruling that this evidence was lacking does not arise to plain error. Mrs. Brown's failure to object at the

13

appropriate time denied the district court the opportunity to rectify any errors.  Therefore, the court's ruling will stand.

VI.

Having found that Burns violated Mrs. Brown's constitutional rights, the next inquiry concerns the possible liability of Bryan County.  Liability will accrue for the acts of a municipal official when the official possesses "final policymaking authority" to establish municipal policy with respect to the conduct that resulted in a violation of constitutional rights.  Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (plurality opinion).

Bryan County stipulated that Sheriff Moore was the final policymaker for the Sheriff's Department.  As such, it is patently clear that Sheriff Moore[17] is an official "whose acts or edicts may fairly be said to represent official policy and whose decisions therefore may give rise to municipal liability under § 1983."  Id. at 480 (citing Monell, 436 U.S. at 694).

Mrs. Brown argues that a municipality can be held liable under § 1983 based on a final policymaker's single decision regarding the hiring or training of one individual.  Appellants, on the other hand, argue that § 1983 liability cannot attach on the basis of a policymaker's single, isolated decision to hire or train one individual.

An argument similar to the Appellants' was rejected by this

---

[17]Appellants failed to object to the jury instructions which referred to Sheriff Moore as the final policymaker. See Gonzalez v. Ysleta Indep. Sch. Dist., 996 F.2d 745, 754 (5th Cir. 1993) (failure to lodge an objection to court's instructions regarding the final policymaker waived the issue).

14

Court in <u>Gonzalez v. Ysleta Indep. Sch. Dist.</u>, 996 F.2d 745, 754 (5th Cir. 1993). In <u>Gonzalez</u>, the Ysleta Independent School District (YISD) was sued for a single decision to transfer a teacher accused of sexually harassing a student, rather than removing him from the classroom. YISD argued that this ad hoc, isolated decision, even when made by policymakers, did not constitute the sort of "policy" upon which municipal liability could be predicated under <u>Monell</u>. This was especially true there, insisted YISD, as the decision was contrary to the district's own formal policy for handling such matters. This argument proved unpersuasive.

Based on the facts before it, the <u>Gonzalez</u> panel concluded that the final policymaker's single, conscious decision, i.e., the Board of Trustee's decision to transfer the teacher rather than remove him from the classroom, constituted a "policy" attributable to the school district. <u>Gonzalez</u>, 996 F.2d at 754. This conclusion was logical, as "[n]o one has ever doubted . . . that a municipality may be liable under § 1983 for a *single decision* by its properly constituted legislative body . . . because even a single decision by such a body unquestionably constitutes an act of official government policy." <u>Pembaur</u>, 475 U.S. at 480 (emphasis added).[18] To deny compensation to the victim in such a case would

_____

[18]In <u>Pembaur</u>, the Supreme Court held that a county prosecutor's single decision, ordering law officers to forcibly enter a dentist's office, was actionable under § 1983. 475 U.S. at 480-81. However, the Court cautioned that liability would only attach where the course of action was deliberately chosen by a decisionmaker possessing final authority to establish municipal policy. <u>Id.</u> at 481. We note that Mr. Pembaur's § 1983 action was premised on a

15

be contrary to the fundamental purpose of § 1983.  Id. at 481.  So, it is clear that a single decision may create municipal liability *if* that decision were made by a final policymaker responsible for that activity.

Mrs. Brown argues that Burns' lengthy criminal history should have prevented Sheriff Moore from hiring him.  Burns' history revealed a string of offenses that, she claims, demonstrates a disregard for the law and a propensity for violence.  Moreover, she maintains that a thorough investigation of Burns' background would have revealed that his parole had been violated by his numerous offenses.  Thus, she argues that Burns' screening and subsequent employment by Sheriff Moore were inadequate and subjected Bryan County to liability.

During the application process Sheriff Moore ordered a printout of Burns' criminal record, which revealed the following citations and arrests: nine moving traffic violations, Actual Physical Control (APC) of a motor vehicle while intoxicated, driving with a suspended license, arrest for assault and battery, conviction for possession of a false identification and an arrest for resisting lawful arrest.  When Sheriff Moore was examined about Burns' "rap sheet," the following exchange took place:

Q.  Did you make an inquiry with the proper authorities in Oklahoma to get a copy of Mr. Burns' rap sheet?

A.  I run his driving record, yes.

---

theory of municipal policy and not on a theory of municipal custom. Id. n.10.

16

Q. All right. And you can get that rap sheet immediately, can't you?
A. It don't take long.

Q. All right. And did you not see on there where Mr. Burns had been arrested for assault and battery? Did you see that one on there?

A. I never noticed it, no.

Q. Did you notice on there he'd been arrested or charged with [Driving While License Suspended] on several occasions?

                    *      *      *
A. I'm sure I did.

Q. All right. Did you notice on there that he'd been arrested and convicted for possession of false identification?

A. No, I never noticed that.

Q. Did you notice on there where he had been arrested for public drunk?

A. He had a long record.

Q. Did you notice on there where he had been arrested for resisting arrest?

A. No, I didn't.

Q. Did you make any inquiries after you got that information to determine exactly what the disposition of those charges were?

A. No, I didn't.

Q. Did you not make any attempt to find out the status of Mr. Burns' criminal record at that time?

A. As far as him having a criminal record, I don't believe he had a criminal record. It was just all driving and -- most of it was, misdemeanors.

Q. Well, did you make any attempts to determine whether or not Mr. Burns was on probation at the time you placed him out there?

A. I didn't know he was on probation, no.

Q. Did you make any effort to find out?

A. I didn't have no idea he was on probation, no.

17

Q.  Well, you saw on his rap sheet where he had been charged with [Driving Under the Influence], didn't you?

A.  I had heard about that.  I don't remember whether I had seen it on the rap sheet or not.

Q.  So you'd heard about it?

*     *     *

A.  I don't remember whether I seen it on the rap sheet or heard about it.

Besides this damaging testimony, Mrs. Brown's expert[19] testified regarding the importance of properly screening law enforcement applicants.  The expert testified that a thorough investigation process is needed to weed out individuals who enter the police force for the wrong reasons, for example, because "they like to exert their power."  In light of Burns' arrest record, the expert concluded that he showed a "blatant disregard for the law and problems that may show themselves in abusing the public or using excessive force," thereby rendering Burns unqualified for a position in law enforcement.  The expert further testified that as a minimum, Sheriff Moore should have investigated the disposition of the charges against Burns.  Even Appellants' expert, Ken Barnes, agreed that Burns' criminal history should have caused some concern, meriting a further review of the applicant.  More importantly, when Mr. Barnes was asked if he would have hired Burns, he replied that it was "doubtful."

From the foregoing evidence, the jury could have reasonably

---

[19]The record shows that the expert, Dr. Otto Schweizer, had spent over twenty years in law enforcement, including, several years as a field training officer, a police chief and as a professor of criminal justice and police administration at the University of Central Oklahoma.

18

inferred that Sheriff Moore "closed his eyes" to Burns' background when hiring him. This inference is reinforced by Burns' familial relations within the Sheriff's Department: not only is Burns the son of Sheriff Moore's nephew, but Burns' grandfather had been involved with the department for more than sixteen years. Alternatively, the jury could have inferred that Sheriff Moore was indeed aware of Burns' past problems with the law and was therefore cognizant of his deficient character, but nevertheless opted to employ him because he was "family".[20] Again, the innuendos of nepotism only bolster the inference that Burns would have been hired *regardless* of his criminal history.

We believe that the evidence supports the jury's conclusion that Sheriff Moore did not conduct a good faith investigation of Burns. Although it is true that Sheriff Moore ran a NCIC check of Burns, this action was futile given that Burns' arrest history was all but ignored. Sheriff Moore conceded that Burns' record was so long that he did not bother to examine it. And, except for this feeble attempt to screen him, no other effort was made to investigate Burns. A further examination would have revealed that Burns had repeatedly violated probation, and that a warrant was subsequently issued for his arrest. In light of this history, it should have been obvious to Sheriff Moore that a further

---

[20]In light of the string of arrests and convictions, a jury could properly conclude that Burns had a propensity for violence and a disregard for the law, thus, precluding his employment. We deem such a conclusion proper, even though Burns had no felonies on his record. Oklahoma law prevents a sheriff from hiring an individual convicted of a felony or a crime involving moral turpitude. OKLA. STAT. ANN. tit. 70, § 3311(d)(2) (West 1994).

investigation of Burns was necessary.

We also find the evidence sufficient for a jury to conclude that Sheriff Moore's decision to hire Burns amounted to deliberate indifference to the public's welfare. See Stokes v. Bullins, 844 F.2d 269, 275 (5th Cir. 1988); Wassum v. City of Bellaire, Texas, 861 F.2d 453, 456 (5th Cir. 1988); Benavides v. County of Wilson, 955 F.2d 968, 972 (5th Cir.), cert. denied, --- U.S. ---, 113 S.Ct. 79 (1992). In light of the law enforcement duties assigned to deputies, the obvious need for a thorough and good faith investigation of Burns, and the equally obvious fact that inadequate screening of a deputy could likely result in the violation of citizens' constitutional rights, Sheriff Moore can reasonably be said to have acted with deliberate indifference to the public's welfare when he hired Burns. See City of Canton v. Harris, 489 U.S. 378, 390 (1989).[21] The failure to conduct a good faith investigation of the prospective employee amounted to Sheriff Moore deliberately closing his eyes to the Burns' background.[22] Such indifferent behavior cannot be tolerated when the prospective

[21]Further, the lower court's charge to the jury was proper: "Sheriff B.J. Moore would have acted with deliberate indifference in adopting an otherwise constitutional hiring policy for a deputy sheriff if the need for closer scrutiny of Stacy Burns' background was so obvious and the inadequacy of the scrutiny given so likely to result in violations of constitutional rights, that Sheriff B.J. Moore can be reasonably said to have been deliberately indifferent to the constitutional needs of the Plaintiff."

[22]It is certainly true that the Sheriff had conducted adequate background checks on other deputies and assured himself that they were certified before putting them on the street, but the fact that he diverged from that practice as to this one individual does not save the County from liability. See Gonzalez v. Ysleta Indep. Sch. Dist., 996 F.2d 745, 754 (5th Cir. 1993).

applicant will be employed in a position of trust and authority.

Additionally, the jury could find that hiring an unqualified applicant and authorizing him to make forcible arrests actually caused the injuries suffered by Mrs. Brown. That is, the policymaker's (Sheriff Moore's) single action of hiring Burns without an adequate review of his background directly caused the constitutional violations of which Mrs. Brown now complains. Benavides, 955 F.2d at 972; Fraire v. City of Arlington, 957 F.2d 1268, 1277 (5th Cir.) (section 1983 liability attaches only "where the municipality itself causes the constitutional violation" at issue), cert. denied, ---U.S.---, 113 S.Ct. 462 (1992). Therefore, the violation of Mrs. Brown's constitutional rights was affirmatively linked to Bryan County's decision to hire Burns for law enforcement activities. Stokes v. Bullins, 844 F.2d 269, 276 (5th Cir. 1988).

### CONCLUSION

After a thorough review of the record, this Court finds that the evidence supports the jury's verdict holding Burns and Bryan County liable for Mrs. Brown's § 1983 claim based on her false arrest, false imprisonment and the inadequate hiring of Burns. We also find that the district court did not plainly err in dismissing the jury's award for Mrs. Brown's loss of past income and future earning capacity. For these reasons, the jury's verdict stands and the district court's judgment is

AFFIRMED.